MATANUSKA ELECTRIC ASSOCIATION, INC., Appellant,

v.

MUNICIPALITY OF ANCHORAGE, d/b/a Municipal Light & Power, and Golden Valley Electric Association, Inc., Appellees.

No. S–12568.

Supreme Court of Alaska.

May 23, 2008.

Kyle W. Parker, David J. Mayberry, and Rebecca S. Copeland, Patton Boggs LLP, Anchorage, for Appellant.

Dean D. Thompson and Paul J. Jones, Kemppel, Huffman, and Ellis, P.C., Anchorage, for Appellee Municipality of Anchorage, d/b/a Municipal Light & Power.

Kirk H. Gibson, Ater Wynne LLP, Portland, Oregon, for Appellee Golden Valley Electric Association, Inc.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Matanuska Electric Association, Inc. (MEA) appeals a ruling from the Regulatory Commission of Alaska. MEA contends that the Commission acted outside its jurisdiction when it ordered MEA to continue operating its transmission line at a voltage that exceeds the line's designed maximum, and that the Commission committed reversible error when it denied MEA permission to cross-examine a witness. Because substantial evidence aside from the challenged testimony supports the Commission's decision, we affirm.

## II. FACTS AND PROCEEDINGS

This appeal concerns twenty miles of transmission line (the Line) owned and operated by MEA. The Line runs northward from a location outside of Wasilla to MEA's Douglas Substation in the community of Willow. It functions as part of the Alaska Inter-

tie, most of which was constructed with state funds by the Alaska Energy Authority (the Authority)[1] in the early 1980s to provide a means of transmitting energy from a planned hydroelectric facility, the Susitna project, to northern and southern electric utilities. The Susitna project never came to pass, but the Intertie continues to serve an important role as the exclusive link between electric utilities from Fairbanks to the Kenai Peninsula.

The Authority incorporated the Line into the Intertie in order to speed construction, minimize costs, and avoid duplicating facilities. The Authority entered into a Transmission Services Agreement with MEA on December 18, 1986. Under that agreement, MEA retains ownership of the Line; but the Line operates as part of the Intertie under the control of the Intertie Operating Committee.

The Transmission Services Agreement contemplates an operational voltage of 138 kilovolts (kV) for the Line. This voltage equals that of adjoining sections of the Intertie. Unlike those facilities, however, the Line was designed to be energized at only 115kV. MEA maintains that "conversion of [the Line] to 138kV operation was always intended as a temporary situation." Nevertheless, 138kV has remained the operational voltage for the Line since the Authority entered into the Transmission Services Agreement with MEA in 1986. The Authority and MEA set the Transmission Services Agreement to expire on July 1, 2004. On May 9, 2003, MEA General Manager Wayne Carmony wrote to notify the Authority of MEA's intent to discontinue the parties' arrangement. He cited MEA's need for "the flexibility of operating [the Line] in the manner of our choosing, in either a single or double circuit configuration." He did not mention concerns about safety hazards or performance failures linked to energizing the Line at

138kV. MEA maintains, however, that its "decision to terminate the [Transmission Services Agreement] was motivated by its desire to return [the Line] to 115kV operation in order to minimize the costly operational impacts which had arisen during the term of the [Transmission Services Agreement]."

MEA invited the Authority to negotiate a new agreement, but the two sides failed to reach an accord. MEA also attempted to strike separate bargains with the individual utilities that wheel power across the Line, but these efforts failed to advance beyond the initial stages of talks.[2]

On October 30, 2003, the "Intertie Participants," a collection of utilities[3] that distribute electricity across the Intertie and the Line, applied to the Commission for continued joint use of the Line. Pending proceedings before the Commission, MEA agreed to allow the Intertie Participants to continue using the Line under similar terms until December 31, 2004. The Commission requested that the parties pre-file testimony and held a two-day hearing beginning on October 28, 2004. The Intertie Participants presented testimony from two Golden Valley officers and a consultant. MEA presented the testimony of three of its officers as well as that of its own consultant.

Much of the evidence before the Commission concerned whether the Line could operate at 138kV in a safe and reliable manner. The Commission noted that some thirty flashover outages had occurred along the Line after it began operating at the higher voltage in 1986. The parties disputed the significance and cause of these outages, with MEA asserting that conversion of the Line to 138kV had rendered the Line unreliable and dangerous. The parties disagreed whether the voltage differential posed a safety threat.[4]

---

1. The Alaska Energy Authority's predecessor, the Alaska Power Authority, managed the construction.

2. According to MEA, Golden Valley Electric Association, Inc. (Golden Valley) expressed interest in these negotiations but refused to enter into a "routine confidentiality agreement."

3. Specifically, Golden Valley; Municipality of Anchorage d/b/a Municipal Light and Power (ML

& P); Chugach Electric Association, Inc.; and City of Seward, d/b/a Seward Electric System filed applications with the Commission.

4. The parties also presented evidence to the Commission in support of rival "wheeling rates"—the compensation that MEA receives for the joint use and interconnection of the Line.

The parties presented the testimony of several witnesses to the Commission, with that of Golden Valley officer Steven Haagenson bearing particular relevance to this appeal. Like the other witnesses, Haagenson was made available for cross-examination during the hearing, but MEA indicated that it had no questions for him. The two commissioners in attendance followed suit, also declining to ask Haagenson any questions. The next day, however, Chairman Giard recalled Haagenson to the stand and solicited information about the costs of reverting the Line to 115kV. Haagenson testified as to the construction expense and downtime associated with installing a transformer.

At the conclusion of that testimony, MEA's counsel requested permission to cross-examine Haagenson. The hearing examiner denied MEA's request, explaining: "ordinarily I only allow examination for any questions that exceed the scope of your [earlier cross] examination and since there was none I don't really have a whole lot of options there." Counsel for MEA responded, "All right." MEA made no representation or offer of proof at the hearing regarding the testimony it proposed to elicit on cross-examination. But on appeal MEA alleges that its cross-examination would have demonstrated that reverting the Line to 115kV would require at most two hours of downtime, not the six months to a year that Haagenson indicated in his testimony.

The Commission ruled that the Line should continue operating at 138kV, reasoning that evidence presented on three design parameters, which vary according to a transmission line's voltage level—ground clearance, insulation, and phase spacing—failed to demonstrate significant safety or operational hazards.

First, the Commission noted that the Line's ground clearance conformed to standards set under the National Electrical Safety Code for 115kV transmission lines constructed over cultivated fields. This means that MEA maintains its transmission line at least 20.2 feet above the ground, ostensibly to accommodate farm machinery that may cross beneath the Line. By way of comparison, a 138kV transmission line must clear cultivated fields by 20.4 feet. The Commission deemed this height differential to be *de minimis*, and further noted that "[t]here are no cultivated fields under [the Line,] therefore, the ground clearance should be more than adequate to accommodate the increased voltage on the [L]ine."

The alleged inadequacy of the insulation and phase spacing along the Line similarly failed to impress the Commission. Insulation, in the form of porcelain bells fixed along a transmission line, protects against flashovers, in which electric energy arcs from the wire conductor to the structure bearing the Line. Flashovers cause service outages and create carbon deposits that cause more frequent flashovers. The Commission noted the Rural Utilities Service's requirement that 138kV transmission lines carry eight porcelain insulator bells between structures, one more bell than that recommended for 115kV lines. The Commission, however, found "no persuasive evidence that installing the additional bell will markedly improve the reliability of that line," and determined that in any event, nothing prevented MEA from exercising "the option to install the additional insulator bell since the [L]ine was converted to 138kV usage 17 years ago."

Similarly, the Commission implicitly dismissed MEA concerns that inadequate phase spacing could account for service interruptions along the Line. Phase spacing refers to the horizontal distance between transmission lines. It prevents electric energy from arcing between adjacent wires and other electric conductors, thereby causing the circuit breakers to open and de-energize a line, interrupting service. The Commission pointed out that the "standard for phase spacing is greater for a 138kV line than a 115kV line." The Commission declined to give further treatment to the phases—pacing issue in its decision but concluded generally that although "MEA argued that the flashover outages it has experienced on [the Line] are the result of operating the [L]ine at the higher voltage," the utility "did not submit persuasive evidence that the outages were caused by flashovers." Rather, the Commission found "persuasive evidence that the flashovers would be continual if they were the

result of operating the [L]ine at a higher voltage."

In addition to finding that the Line could operate safely and reliably at 138kV, the Commission pointed out that returning the Line to 115kV operation would entail its own costs:

> Conversion of the line [to] 115kV usage at this time would require approximately $1 million to install a transformer. There is no persuasive evidence that the expenditure is necessary. In addition, the line would not be operational for approximately six months to one year while a transformer was installed.[5] There are no redundant facilities to transport power during the interim. Any benefits of such conversion are not outweighed by the costs.

On January 31, 2005, MEA appealed the Commission's order to the superior court and at the same time filed a motion to require further testimony from Haagenson. Superior Court Judge Sen K. Tan denied MEA's motion for supplemental testimony. After hearing oral argument, the superior court affirmed the Commission's decision. As a preliminary matter, Judge Tan rejected MEA's claim that the case presented a jurisdictional question, ruling that the issue surrounding the Line's operation at 138kV posed "a question of fact, not a question of law." Judge Tan went on to find substantial evidence supporting the Commission's conclusions that the Line could operate safely and reliably at 138kV. Judge Tan held that the Commission had not abused its discretion in refusing to allow MEA's cross-examination of Haagenson because MEA failed to make an offer of proof, and "the request to ask a question on clarification was not evident from the context of the question." Finally, Judge Tan reasoned that any error that did occur was harmless. MEA appeals.

5. Golden Valley concedes that the Commission erred in this factual determination. Construction of the facilities necessary to revert the Line to 115kV operation could extend up to a year; however, the disconnection time associated with the voltage shift apparently would take "at most 1–2 hours."

## III. STANDARD OF REVIEW

We directly review the Commission's action at issue in an administrative appeal.[6] We uphold the Commission's determinations of fact if review shows "substantial evidence" or "relevant evidence that a reasonable person might accept as adequate to support them."[7] We review decisions to admit or exclude evidence for abuse of discretion and will uphold an evidentiary ruling unless it erroneously "affected the substantial rights of a party."[8]

## IV. DISCUSSION

MEA argues first that the Commission lacks the authority to order operation of the Line at 138kV because doing so violates national safety codes incorporated by Alaska law. MEA emphasizes that "no other electric line in the state is operated above its design voltage." MEA contends that the Commission ignored the substantial cost of operating at 138kV, in contravention of its mandate to regulate utilities in the best interests of the public. Second, MEA argues that the hearing examiner erred in barring further questioning of Haagenson, contending that this led the Commission to make an erroneous finding on the disconnection time associated with reverting the Line's operation to 115kV. MEA maintains that the Commission's order demonstrates that the alleged misunderstanding had a material effect on the outcome of the case.

### A. The Commission Did Not Err in Ruling that the Line Must Continue To Operate at 138kV.

Alaska Statute 42.05.321 governs scenarios in which public utilities, such as MEA and the Intertie Participants, "fail[] to agree upon the joint use or interconnection of facilities or the condition or compensation for joint use or interconnections." The statute instructs the Commission to "prescribe rea-

6. *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003).

7. *Amerada Hess Pipeline Corp. v. Regulatory Comm'n of Alaska*, 176 P.3d 667 (Alaska 2008).

8. *Fleegel v. Estate of Boyles*, 61 P.3d 1267, 1270 (Alaska 2002).

sonable conditions . . . for joint use" where it finds "that public convenience and necessity require the joint use or connection, and that the use or connection will not result in substantial injury to the owner utility or its customers, or in substantial detriment to the services furnished by the owner utility, or in the creation of safety hazards." [9] As the Commission noted in its decision, "the crux of this controversy" concerns not whether public convenience and necessity require joint use of the Line, but whether that use must continue at 138kV. That inquiry turns on whether operation at 138kV creates safety hazards or significantly affects the reliability of MEA's services, and it presents a question of fact.[10] Because substantial evidence in the record supports the Commission's conclusion that the Line can be operated safely and reliably at 138kV, we affirm its decision.

The Commission based its decision on the design of the Line, the past performance of the Line at 138kV, and the costs of reverting the Line to 115kV operation. MEA argues that these factors counsel against operating the Line at 138kV. MEA invokes two statutes in support of its claim. The first, AS 10.25.440, mandates that "construction of electric lines . . . shall, as a minimum requirement, comply with the standards of the National Electrical Safety Code in effect at the time of construction." The second, AS 18.60.580, provides that "the Department of Labor and Workforce Development may, by regulation, adopt the most recent [National Electrical Safety Code] to constitute the minimum electrical safety standards of the state." [11] MEA contends that the Commission's decision forces the utility to operate in violation of the National Electrical Safety Code.

But MEA fails to cite a specific code violation that arises out of the Line's operation at 138kV. MEA simply points out, as the parties concede, that the Line was neither constructed nor modified to operate at 138kV. Since the Line was constructed to operate at 115kV, MEA reasons that transmitting 138kV across it without modification must violate the construction requirements of AS 10.25.440 and, by extension, the National Electrical Safety Code.

The Commission recognized that the Line "was designed to operate at 115kV" but nevertheless found "the line can be safely operated at 138kV if it is properly maintained." MEA fails to directly challenge that ruling. For example, the Commission noted that the Rural Electrification Administration recommends an additional insulator bell for 138kV lines, as compared to 115kV lines. But MEA does not clarify whether having one fewer bell rises to the level of a safety code violation, or if any other aspect of the Line, as it operates today, fails to comport with the National Electrical Safety Code's and Alaska law's minimum standards.[12] Delbert LaRue, the design engineer of the Line, testified that he provided for a margin of safety in the Line's design that permits safe operation at a "greater voltage." LaRue did not know where the "upper end" of the permissibly higher voltage might lie, but he assured the Commission that "as it is right now," the Line can "continue to operate in a safe and reliable manner at 138kV." MEA's own director of operations, Robert Drake, made no indication that operation of the Line at 138kV violated the National Electrical Safety Code, testifying that he was "not aware of any code violation" on the Line.

---

**9.** AS 42.05.321.

**10.** MEA argues that the issue whether the Commission erred in requiring the Line to operate at 138kV "is a question of law going to the Commission's jurisdiction under the provisions of its enabling act, AS 42.05.141." But MEA's claim that the Commission acted outside of its jurisdiction hinges on complex factual assessments of the proper safety parameters for the Line. MEA misplaces its reliance on *Homer Electric Ass'n, Inc. v. City of Kenai*, 816 P.2d 182, 184 (Alaska 1991), in which we adopted the "substitution of judgment" test to review a lower court's ruling

that the Alaska Public Utilities Commission lacked jurisdiction to decide a dispute.

**11.** The Department of Labor has promulgated regulations implementing AS 18.60.580. *See* 8 Alaska Administrative Code (AAC) 70.025(b) (adopting the 2002 Edition of the National Electrical Safety Code by reference as the "minimum electrical safety standards of the state").

**12.** MEA does not contend that Alaska law compels utilities to follow the Rural Electrification Administration standards or any other standards apart from the National Electrical Safety Code.

MEA's expert engineering witness, Michael Moore, testified that he "considered reliability, safety and liability issues arising from . . . continued operation" of the Line at 138kV. Moore concluded that "several problems related to operating [the Line] at 138kV, including insulation, vertical clearance and phase spacing requirements . . . result in increased public safety and reliability risks." As MEA itself points out, however, Moore "did not address whether [the Line] complies with applicable safety code requirements." And indeed, Moore appears to have considered the voltage issue in the abstract, without taking into account any facts specific to the Line.

Moore testified, for example, that "the approximate half-foot of additional vertical clearance required for a 138kV line as compared to a 115kV line . . . is quite significant." But he did not review whether the vertical clearance of the Line falls short of any applicable height requirements for 138kV transmission lines. Similarly, Moore explained how phase spacing and insulation standards increase with voltage. But his testimony stops short of any assertion that the Line fails to comply with requirements under the law for those parameters. Moore reached only the general conclusion that increasing the Line voltage leads to "increased outages, lower service reliability to [MEA] members, additional safety risks, litigation defense costs, and an increased exposure to liability on [MEA]'s part." This relationship may exist, but neither Moore's testimony nor that of any other witness demonstrated a causal relationship of sufficient significance to claim that the Commission's findings are not supported by substantial evidence.

In contrast, testimony from LaRue directly supports the Commission's finding that "operation of [the Line] at 138kV should not result in substantial injury to MEA or its customers, in the substantial detriment to the services furnished by MEA, or in the creation of safety hazards." LaRue dismissed Moore's testimony, explaining that "[a] cursory review of the parameters noted by Mr. Moore, compared to the actual design, reveals that operating the [Line] at 138kV does not necessarily violate the three parameters questioned by Mr. Moore." In his testimony, LaRue confirmed the adequacy of the Line's phase spacing and insulation for operation at 138kV, noting that if an excess of voltage caused the flashovers on the Line, he "would anticipate that it would be a continual problem." He conceded that he could not confirm "whether anyone has filled in the ground under [the Line] to reduce clearance," but he pointed out that "[s]uch activities should have been noted by [MEA]," and cited the ground clearance parameter in particular as reflecting the "conservatism" in the Line's design. Finally, in response to cross-examination by MEA, LaRue maintained that the Line is "an appropriate line to be energized at 138kV."

MEA points out that LaRue has not "walked the Line" since 1977 and that he fails to take into account the rapid growth of the Matanuska Susitna Borough over the past thirty years. But while MEA has operated the Line at 138kV across the Matanuska Susitna Borough for two decades, it warns only of an incremental increase in safety hazards wrought by operation at 138kV. MEA argues that the Line at 115kV posed a negligible risk to a snowmobiler crossing beneath it, while the Line at 138kV poses a greater risk. But MEA fails to invoke the National Electrical Safety Code or any other objective standard to assert that this risk was not sufficiently abated by the "conservatism" built into the Line's design parameters.

Finally, MEA presents insufficient evidence to overcome the Commission's conclusions regarding the link between the outages that occurred along the Line to its operation at 138kV. Robert Drake, MEA's Director of Engineering, pointed out that flashovers and outages occurred on the Line at a much higher rate, and he blamed "most of these outages of unknown cause" on "inadequate insulation." But Haagenson disputed Drake's assertion, testifying that "there's lots of causes for outages." And LaRue testified that an excess of voltage would cause continual flashovers rather than the sporadic problems experienced along the Line. Finally, MEA fails to challenge the Commission's assertion that "approximately 30 outages over

a 17–year period are not excessive," and "the revenue loss associated with such outages is more than offset by the wheeling revenues generated by the joint use and interconnection."

In conclusion, we are convinced that the Commission examined the evidence presented by the parties, including the testimony of experts in the field, and on the basis of that evidence decided that the Line could be operated safely and reliably at 138kV. Because substantial evidence supports it, we affirm the Commission's decision.

### B. Any Error Made by the Hearing Commissioner in Denying MEA's Request for Further Questioning of Haagenson Was Harmless.

■ MEA argues that the Commission committed reversible error when it denied its request to cross-examine Golden Valley officer Steven Haagenson. Although MEA had previously declined to cross-examine Haagenson, Commission Chairman Giard recalled Haagenson for further questioning that went beyond the scope of his pre-filed testimony. After being recalled to the stand, Haagenson testified about the costs of reverting the Line to 115kV operation, including approximately one million dollars to install a transformer. He then continued:

HAAGENSON: There's also the ancillary cost as well as being disconnected to be modified. You can't get power from Fairbanks to Anchorage either.

CHAIRMAN GIARD: How long do you think that would take, the disconnection, is it weeks or days or . . .

HAAGENSON: You've got to build a substation and pad and breakers to connect it together so I'd say you're six months to a year, I don't know.

Counsel for MEA sought a "clarification" at the close of Haagenson's testimony:

MEA'S COUNSEL: Your honor, no wait, we have no questions for Mr. Haagenson

originally, but I do have one question that is prompted by Commissioner Giard's, a clarification prompted by her question that I would like to ask Mr. Haagenson.

But the hearing examiner refused to permit cross-examination of Haagenson's testimony because MEA had failed to cross-examine Haagenson on his initial testimony:

HEARING EXAMINER CLARK: Well, ordinarily I only allow examination for any questions that exceed the scope of examination and since there was none I don't really have a whole lot of options there.

MEA'S COUNSEL: All right.

MEA's counsel said nothing further to apprise the hearing examiner of what specific issue she wished to clarify when seeking permission for additional questioning.

As Alaska Evidence Rule 103 makes clear, we will not reverse a ruling to exclude evidence "unless a substantial right of the party is affected," and "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." MEA's appeal falls short of meeting all of these requirements.

We agree with the superior court that by failing to make an offer of proof, MEA waived its claim of error on appeal. Nothing in the context of MEA's request to ask a "clarification" question makes apparent that it sought to challenge Haagenson's testimony on the potential downtime associated with reverting the Line to 115kV operation. The transcript shows that MEA's counsel made only a vague reference to Chairman Giard's "question," failing to indicate which of the many questions asked by Chairman Giard gave rise to an answer from Haagenson that affected one of MEA's substantial rights.

MEA argues that the Alaska Rules of Evidence do not apply to this case because the Alaska Administrative Code does not bind hearing officers to follow the rules of evidence.[13] But MEA confuses this grant of

13. *See* 3 AAC 48.154(a).

discretion to administrative officers with its own obligations for preserving its rights on appeal. We have held in the context of other administrative appeals that a "party's failure to make an offer of proof acts as a waiver of any claim of error regarding the exclusion of unspecified evidence." [14] That rule applies here to exclude MEA's claim of error regarding the exclusion of further testimony from Haagenson.

■ Second, assuming that the hearing commissioner committed error by denying MEA's request for further questioning,[15] MEA must still show that the alleged error bore "a substantial influence on the outcome of the case." [16] MEA maintains that the Commission misunderstood Haagenson's testimony. Haagenson testified that construction of "a substation and pad and breakers to connect [the Line and the Intertie] together" could take "six months to a year." The Commission based its decision in part on its observation that "the [L]ine would not be operational for approximately six months to one year while a transformer was installed." Golden Valley concedes that the Commission erred in this factual determination. Construction of the facilities necessary to revert the Line to 115kV operation could extend up to a year, but the disconnection time associated with the voltage shift apparently would take "at most 1–2 hours."

We do not view this possible factual error as a substantial influence on the outcome of the case. The Commission's decision primarily addresses the safety and reliability of operating the Line at 138kV, rather than the cost of operating the Line at 115kV. After having dismissed the safety and reliability

concerns raised by MEA, the Commission's decision notes that "[c]onversion of the [L]ine to 115kV usage at this time would require approximately $1 million to install a transformer. There is no persuasive evidence that the expenditure is necessary." Only after reaching this conclusion did the Commission make its alleged misstatement that "[i]n addition, the [L]ine would not be operational for approximately six months to one year." If the evidence failed to convince the Commission that the conversion would justify the million dollar cost of a transformer, the additional costs of disconnection are unlikely to have influenced the outcome. The Commission's decision gives little indication that the downtime associated with reversion drove its analysis.

## V. CONCLUSION

Because substantial evidence supports the Commission's determination that the Line can operate safely and reliably at 138kV, and because any error in refusing MEA's request for cross-examination was harmless, we AFFIRM.

MATTHEWS, Justice, not participating.

---

**14.** *AT & T Alascom v. Orchitt,* 161 P.3d 1232, 1245 (Alaska 2007) (citing *Adamson v. Univ. of Alaska,* 819 P.2d 886, 889–90 (Alaska 1991)).

**15.** We are inclined to agree with MEA that the hearing commissioner erred in refusing the request for cross-examination.

**16.** *Coulson v. Marsh & McLennan, Inc.,* 973 P.2d 1142, 1146 (Alaska 1999).