*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| REGULATORY COMMISSION OF ALASKA, | ) ) ) ) |
| Appellant, | ) ) |
| v. | ) ) ) |
| MATANUSKA ELECTRIC ASSOCIATION, INC.; CHUGACH ELECTRIC ASSOCIATION, INC.; GOLDEN VALLEY ELECTRIC ASSOCIATION, INC.; MUNICIPALITY OF ANCHORAGE d/b/a MUNICIPAL LIGHT & POWER; HOMER ELECTRIC ASSOCIATION, INC.; ALASKA ENERGY AUTHORITY; and STATE OF ALASKA ATTORNEY GENERAL'S OFFICE, REGULATORY AFFAIRS AND PUBLIC ADVOCACY SECTION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Appellees. | ) ) |
| HOMER ELECTRIC ASSOCIATION, INC., | ) ) ) |
| Appellant, | ) ) |
| v. | ) ) |
| REGULATORY COMMISSION OF ALASKA; CHUGACH ELECTRIC | ) ) ) |

Supreme Court Nos. S-15944/15973 (Consolidated)

Superior Court No. 3AN-14-08890 CI

O P I N I O N

No. 7338 – February 22, 2019

ASSOCIATION, INC.; GOLDEN )
VALLEY ELECTRIC )
ASSOCIATION, INC.; )
MATANUSKA ELECTRIC )
ASSOCIATION, INC.; )
MUNICIPALITY OF ANCHORAGE )
d/b/a MUNICIPAL LIGHT & )
POWER; and ALASKA ENERGY )
AUTHORITY, )
  )
                Appellees. )
  )

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Michael D. Corey, Judge.

Appearances: Stuart W. Goering and Megyn A. Greider, Assistant Attorneys General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellant Regulatory Commission of Alaska. Michael E. Kreger and Sarah C. Gillstrom, Perkins Coie LLP, Anchorage, for Appellant and Appellee Homer Electric Association, Inc. Robin O. Brena, Matthew C. Clarkson, and Kelly M. Moghadam, Brena, Bell & Clarkson, P.C., Anchorage, for Appellees Matanuska Electric Association, Inc. and Chugach Electric Association, Inc. John J. Burns, Golden Valley Electric Association, Inc., Fairbanks, Alaska, for Appellee Golden Valley Electric Association, Inc. Dean D. Thompson and Jonathon D. Green, Kemppel, Huffman and Ellis, P.C., Anchorage, for Appellee Municipality of Anchorage d/b/a Municipal Light and Power. Notice of nonparticipation filed by Brian Bjorkquist, Senior Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee Alaska Energy Authority; and by Jeffrey J. Waller, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee State of Alaska Attorney General's Office, Regulatory Affairs and Public Advocacy Section.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

I.      **INTRODUCTION**

Electrical utilities entered into agreements for the purchase and transmission of energy from a hydroelectric project to utilities in distant service areas. Legislation exempted the agreements from the review or approval of the Regulatory Commission of Alaska (RCA); any disputes were to be resolved instead by a contractually established committee.

Along the transmission pathway was a substation leased by Homer Electric Association (HEA) to Chugach Electric Association (Chugach) and used by Chugach for the transmission of the distant utilities' electricity. When the lease expired, HEA filed tariff applications with the RCA, seeking approval of rates for its own transmission of the other utilities' energy. The other utilities objected to the RCA's jurisdiction, citing their agreements and the legislation exempting the agreements from regulatory review.

The RCA determined that it had the authority to consider the tariff applications. The affected utilities appealed to the superior court, which held that the RCA did not have that authority. HEA and the RCA petitioned for our review, challenging both the superior court's appellate jurisdiction and the merits of its decision regarding the RCA's authority.

We granted review. We reject the challenges to the superior court's jurisdiction. Furthermore, like the superior court, we conclude that the intent of the original agreements and of the governing statute was to exclude disputes like this one

from the RCA's jurisdiction. We therefore affirm the decision of the superior court reversing the RCA's order.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. The Bradley Lake Hydroelectric Project

The Bradley Lake Hydroelectric Project (the Project), located approximately 27 miles northeast of Homer, began commercial operation in 1991.[1] It "consists of a 125-foot high concrete-faced, rock-filled dam structure, three diversion structures, a 3.5-mile long power tunnel and vertical shaft, generating plant, interior substation, 20 miles of transmission line, and substation."[2] The transmission lines connect the power plant to the switching station at Bradley Junction, where Bradley Lake energy is transferred to transmission lines owned by HEA. HEA's lines include "the Soldotna Segment," a 46.8-mile segment from Bradley Junction north to the Soldotna Substation, owned by HEA and — until 2014 — leased to Chugach.

#### 2. The HEA/Chugach lease

Chugach entered into the lease with HEA to "operate and maintain" some of HEA's transmission facilities in September 1985, six years before the Bradley Lake Project began commercial operation. The leased facilities included the Soldotna Substation and two transmission lines connecting that substation with one near Quartz Creek, owned by Chugach. The lines from the Soldotna Substation to the Quartz Creek Substation are called the S/Q Line; they provide the only physical path for the transmission of electricity to utilities other than HEA.

---

[1] ALASKA ENERGY AUTH., BRADLEY LAKE HYDRO PROJECT (2018), http://www.akenergyauthority.org/Portals/0/programs/factsheets/Documents/PFS-BradleyHydro.pdf.

[2] *Id.*

The HEA/Chugach lease expired in January 2014, when HEA removed Chugach's metering equipment at Soldotna Substation and took over operation of the S/Q Line.

### 3.      The Bradley Lake Agreements

Before the Bradley Lake Project was completed, certain Alaska utilities executed agreements for the sale, purchase, and transmission of Bradley Lake energy. Other than HEA, the utilities were what is known as "railbelt" utilities: their service areas lay along the route of the Alaska Railroad from Seward to Fairbanks. None of them owned transmission lines that would provide direct access to Bradley Lake energy.

The primary purpose of the Bradley Lake Agreements, therefore, was the creation of a transmission route for Bradley Lake energy for the utilities that operated to the north. Pursuant to the agreements, HEA transmitted railbelt utilities' energy from Bradley Lake via its Soldotna Segment, at the end of which — at the Soldotna Substation — Chugach accepted delivery. It was Chugach's responsibility to transmit the Bradley Lake energy farther on, first along the S/Q Line to the Quartz Creek Substation and then to more distant delivery points as designated by the other utilities. The sections that follow describe the Bradley Lake Agreements in more detail.

### a.      The Power Sales Agreement

The Agreement for the Sale and Purchase of Electric Power (Power Sales Agreement) had eight signatories: the Alaska Power Authority (Power Authority), the Alaska Electric Generation & Transmission Cooperative (AEG&T),[3] Chugach, HEA, Golden Valley Electric Association (GVEA), Matanuska Electric Association (MEA),

---

[3]      AEG&T is the prior iteration of the Alaska Electric & Energy Cooperative, Inc. (AEEC), which identified itself in pleadings as an "electrical utility cooperative providing transmission (115kV) and related ancillary services over its transmission facilities to electric utility companies in Alaska, including to its sole member, [HEA]."

the Municipality of Anchorage d/b/a Municipal Light & Power (ML&P), and the City of Seward d/b/a Seward Electric System. Under the Power Sales Agreement, the Power Authority — the predecessor to today's Alaska Energy Authority — agrees to sell, and the other parties agree to purchase, certain shares of the Bradley Lake Project's energy capacity. The Power Sales Agreement designates the physical point "at which the Purchasers accept delivery" of their Project energy: the switching station at Bradley Junction. The Agreement further provides that absent mutually-agreed termination or renewal, it remains in effect either for "50 years after the Date of Commercial Operation" or until all bonds issued to fund the Project have been "satisfied or provided for, whichever occurs later."

The Power Sales Agreement also establishes a committee — generally referred to as the Project Management Committee or BPMC — "responsible for the management, operation, maintenance, and improvement of the Project," including the "scheduling, production and dispatch" of Bradley Lake energy. The Project Management Committee, composed of the Power Authority and the purchasing utilities, is required among other things to "[a]dopt procedures . . . for the resolution of disputes that may arise between or among the Purchasers and the Authority concerning the interpretation of this Agreement, the obligations created by this Agreement, or the performance of such obligations."

b.     **The Services Agreement**

Chugach and the other energy-purchasing utilities, including HEA and AEG&T, contemporaneously entered into the Agreement for the Wheeling of Electric Power and for Related Services (Services Agreement), which governs the transmission of Bradley Lake energy from the Project to the railbelt utilities' own transmission systems. The Services Agreement contemplates that purchasing utilities will deliver Bradley Lake energy to Chugach at the Soldotna Substation, which is defined in the

Agreement as "[t]he Soldotna Substation owned and operated by [HEA], or any successor facility at which Bradley Lake Energy can be and is delivered to Chugach at Chugach's metering point by a Wheeling Utility for services under this Agreement." The utility may then request that Chugach provide "wheeling services" (meaning a utility's use of its facilities to transmit another utility's electricity).[4]  A request for wheeling services requires Chugach to wheel the energy to the requesting utility's "Delivery Point" designated in the Agreement.  The "applicable wheeling rates" are to be established and modified "only in accordance with . . . Appendix A" attached to the Agreement.

Alternatively, the utility may ask Chugach to store or purchase the electricity delivered to the Soldotna Substation, and Chugach is required to comply; compensation for these services is also set out in the Agreement.  The Agreement further obligates Chugach to "operate, maintain, and repair the electrical facilities used to perform the services provided hereunder," subject to "the capability of Chugach's generation and transmission system" as it then existed and to Chugach's priority to first meet "the safety, efficiency, and economic needs of [its] own system."

The Services Agreement requires the parties to meet at least quarterly to discuss any "difficulties encountered" or alleged failures to perform; and the parties agree that "any further procedures for dispute resolution under [the Services Agreement] shall be entrusted (if the Authority concurs) to good faith negotiation and adoption by

---

[4]        *See Puget Sound Energy v. State, Dep't of Revenue*, 248 P.3d 1043, 1046 n.6 (Wash. App. 2010) (noting regulatory definition of "wheeling" as "the activity of delivering or distributing electricity owned by others using power lines and equipment of the person doing the wheeling"); *see also Matanuska Elec. Ass'n v. Municipality of Anchorage*, 184 P.3d 19, 21 n.4 (Alaska 2008) (defining "wheeling rates" as "the compensation [a utility] receives for the joint use and interconnection of [its transmission line]").

the Project Management Committee, with Chugach's affirmative vote required for adoption of such procedures." Finally, the Services Agreement provides that the "Agreement in its entirety reflects the meeting of the minds among the Parties" and that "there exists no agreement among the Parties that services will be provided to the Wheeling Utilities for Bradley Lake Energy . . . on terms or conditions other than as set forth in this Agreement."

### c. The Capability Agreement

A third Bradley Lake Agreement is the Amendment to Agreement for Sale of Transmission Capability (the Capability Agreement), executed by HEA, AEG&T, Chugach, GVEA, and ML&P.[5] The Capability Agreement confirms HEA's intent to construct two transmission lines from Bradley Junction, one of them "the Soldotna Segment" between Bradley Junction and the Soldotna Substation. HEA commits to sell, and the other parties commit to buy, shares of the carrying capacity of the Soldotna Segment equal to their shares in the Bradley Lake Project. HEA assumes the duty to "in good faith and at all times operate, maintain and repair the electrical facilities used to perform the services provided" under the Capability Agreement. The parties again "agree that any procedures for dispute resolution under [the Capability Agreement] be entrusted to good faith negotiations and adoption by the Project Management Committee," this time "with HEA's affirmative vote required for adoption of such procedures."

In sum, thus, the Bradley Lake Agreements describe the following transmission pathway for Bradley Lake energy purchased by utilities other than HEA: (1) pursuant to the Power Sales Agreement, the utilities accept the Power Authority's

---

[5]     The Capability Agreement is actually an amendment to an earlier agreement among the same parties, preexisting completion of the Bradley Lake Project, for "the sale and purchase of a portion of the transmission capability of the Soldotna Segment."

delivery of energy at the Bradley Lake Substation; (2) pursuant to the Capability Agreement, HEA transmits the other utilities' energy from there to the Soldotna Substation via the Soldotna Segment; and (3) pursuant to the Services Agreement, Chugach wheels the energy from there to the Quartz Creek Substation via the S/Q Line before wheeling the energy farther north along its own transmission lines to delivery points designated by the railbelt utilities.

### 4. Legislative action

Bradley Lake's energy potential was studied for decades before the Project became a reality.[6] In 1982 the Power Authority assumed responsibility for moving it forward.[7] At that time the Alaska Public Utilities Commission (APUC) — the predecessor of the RCA[8] — "did not have review and approval authority for power sales contracts" such as those contemplated by the Project.[9] That changed in 1986, when the legislature amended AS 42.05.431 to require that wholesale power agreements receive

---

[6] *See* ALASKA ENERGY AUTH., *supra* note 1 ("The power generation potential of Bradley Lake was first studied by the U.S. Corps of Engineers in 1955. The project was authorized by Congress in 1962."); *see also* Ch. 90, § 1, SLA 1981 (appropriating funds); Ch. 92, § 69, SLA 1981 (amending appropriation).

[7] *See* Ch. 133, § 20, SLA 1982 ("Subject to review of the feasibility study and the plan of finance by the division of budget and management in the Office of the Governor under AS 44.83.384(c)(2), the Bradley Lake hydroelectric project is approved as a project of the Alaska Power Authority under AS 44.83.384(c)(1).").

[8] *See Amerada Hess Pipeline Corp. v. Regulatory Comm'n of Alaska*, 176 P.3d 667, 670 (Alaska 2008).

[9] Hearing on H.B. 356 Before the Sen. Res. Comm., 15th Leg., 2d Sess. (Feb. 29, 1988) (testimony of Rob LeResche, Exec. Dir., Alaska Power Auth.).

the APUC's approval.[10]

A bill introduced the following year, supported by the Power Authority,[11] was intended in part to remove the APUC's jurisdiction to review wholesale power agreements.[12] The bill was passed by the legislature[13] but vetoed by Governor Cowper,[14] and his veto was sustained.[15] The governor's veto message focused on the bill's deregulatory effect on dozens of "small public utilities in the state"; the governor specifically "did not reach the question of whether the exemption of Bradley Lake from [APUC] review is in the public interest at this time," saying he "hope[d] to have an opportunity to review that question in the interim."[16]

Meanwhile, interested utilities were waiting to execute the Power Sales Agreement pending the outcome of legislative action on proposed electric energy interties from Homer to Fairbanks.[17] By the end of the 1987 legislative session, however,

---

[10]    *See* Ch. 104, § 5, SLA 1986; *see also* AS 42.05.431(b) ("A wholesale power agreement between public utilities is subject to advance approval of the commission.").

[11]    Senate Bill (S.B.) 22, 15th Leg., 1st Sess. (1987); Hearing on H.B. 356 Before the Sen. Res. Comm., 15th Leg., 2d Sess. (Feb. 29, 1988) (testimony of Bob LeResche, Exec. Dir., Alaska Power Auth.).

[12]    House Committee Substitute for Committee Substitute for Sponsor Substitute for Senate Bill (H.C.S.C.S.S.S.S.B.) 22, 15th Leg., 1st Sess. (1987).

[13]    1987 Senate Journal 1610-11.

[14]    1987 Senate Journal 1731.

[15]    1987 Senate Journal 1756-57.

[16]    1987 Senate Journal 1731.

[17]    Hearing on H.B. 356 Before the Sen. Res. Comm., 15th Leg., 2d Sess.
(continued...)

the legislature had not authorized the interties or appropriated funds for them, and there was "not a lot of hope" for such action in the future.[18]  At that point, the Power Authority refused to proceed with the Bradley Lake Project until it had binding agreements for the sale of Bradley Lake energy "in hand."[19]  In later testimony to the legislature, the Power Authority's executive director, Bob LeResche, described the negotiations resulting in the "paper intertie" laid out in the Services and Capability Agreements, by which the interested utilities "concocted a way in which they could get the Bradley power distributed to each of the buyers on existing interties with people paying certain amounts under certain principles."[20]

The Bradley Lake Agreements, however, would only become effective upon receipt of "all necessary approvals."[21]  And as LeResche explained, there were only two ways to get the necessary approvals:  "One is to run them through the [APUC] and through the courts thereafter if someone appeals the [APUC's] decision . . . [a]nd the second way is by passing [a] bill which eliminates the necessity for those [APUC] agreements."[22]

To address these concerns the House Rules Committee, at the governor's request, introduced a bill in January 1988 that again sought to amend AS 42.05.431 to

---

[17]     (...continued)
(Feb. 29, 1988) (testimony of Bob LeResche, Exec. Dir., Alaska Power Auth.).

[18]     *Id.*

[19]     *Id.*

[20]     *Id.*

[21]     *Id.*

[22]     *Id.*

limit regulatory oversight of Bradley Lake power.[23]   During a House Judiciary Committee hearing on the bill, H.B. 356, the committee chair described the bill's threefold purpose:  (1) "to ensure the completion of Bradley Lake in a timely manner without any potential delays caused by intervenors in [APUC] hearings"; (2) to ensure that Project bondholders "are adequately secured"; and (3) to "minimize the deregulation of the railbelt utility" (ostensibly addressing the concern of Governor Cowper's 1987 veto).[24]   During a later hearing of the Senate Resources Committee, LeResche stressed the importance of avoiding the costs of further delay, which he estimated to be "10 to 12 million dollars a year as we sit on this project"; he also testified that "the bond buying community puts a significant premium on revenue bonds . . . secured by contracts" that are subject to regulatory review, meaning that "the rate payers who are going to pay off these bonds . . . would have to pay significantly higher interest on the bonds if the contract were under [APUC] review now and in the future."[25]

---

[23]     *See* H.B. 356, 15th Leg., 2d Sess. (1988) ("An Act relating to the authority of the Alaska Public Utilities Commission in connection with certain activities of the Alaska Power Authority . . . .").

[24]     Hearing on H.B. 356 Before the House Judiciary Comm., 15th Leg., 2d Sess. (Jan. 28, 1988) (statement of Representative John Sund, Chair, House Judiciary Comm.).  In the order here under review, the RCA found that the legislative history of AS 42.05.431(c) "shows that this exception was intended to 'minimize the deregulation of railbelt utilities.' "  This appears to be incorrect.  Chairman Sund's comments logically refer to the fact that H.B. 356 omitted that aspect of S.B. 22 that would have removed APUC "regulation over . . . 67 small public utilities in the state"; it was this deregulatory effect that had prompted Governor Cowper's veto of S.B. 22.  1987 Senate Journal 1731. The perception that H.B. 356 minimized deregulation was due to what the bill omitted, not what it contained.

[25]     Hearing on H.B. 356 Before the Sen. Res. Comm., 15th Leg., 2d Sess. (Feb. 29, 1988) (testimony of Bob LeResche, Exec. Dir., Alaska Power Auth.).

LeResche also described the negotiating process that resulted in the Bradley Lake Agreements.[26] He explained the Agreements' interdependency and why H.B. 356 should be viewed as excluding all of them from regulatory oversight: "[T]he bargain between the State and the utilities isn't just the power sales agreement, nor just the wheeling agreements, but it's the intertwined sum of those three agreements. That's the bargain they've struck."[27] Because of this contractual interdependency, he testified, "[t]here is no logic and no good sense to trying to excise some of those agreements out for special regulatory treatment from the others."[28]

House Bill 356 was passed into law in 1988.[29] As enacted, it amended AS 42.05.431 by adding the following subsection:

> (c) Notwithstanding (b) of this section [requiring APUC review of wholesale power agreements],
>
> (1) a wholesale agreement for the sale of power from a project licensed by the Federal Energy Regulatory Commission on or before January 1, 1987, and related contracts for the wheeling, storage, regeneration, or wholesale repurchase of power purchased under the agreement, entered into between the Alaska Power Authority and one or more other public utilities or among the utilities after October 31, 1987, and before January 1, 1988, and amendments to the wholesale agreement or related contract, are not subject to review or approval by the commission until all long-term debt incurred for the project is retired; and

---

[26] Hearing on H.B. 356 Before the House Judiciary Comm., 15th Leg., 2d Sess. (Jan. 27, 1988) (testimony of Bob LeResche, Exec. Dir., Alaska Power Auth.).

[27] *Id.*

[28] *Id.*

[29] Ch. 11, §§ 1, 2, SLA 1988.

(2) a wholesale agreement or related contract described in (1) of this subsection may contain a covenant for the public utility to establish, charge, and collect rates sufficient to meet its obligations under the contract; the rate covenant is valid and enforceable.[30]

The bill also amended AS 42.05.511 — subsequently renumbered to AS 42.05.431(e)[31] — by adding the following subsection:

(d) Validated costs incurred by a utility in connection with the related contracts described in AS 42.05.431(c)(1) must be allowed in the rates charged by the utility. In this subsection, "validated costs" are the actual costs that a utility uses, under the formula set out in related contracts described in AS 42.05.431(c), to establish rates, charges for services and rights, and the payment of charges for services and rights. This subsection does not grant the commission jurisdiction to alter or amend the formula set out in those related contracts.[32]

## B. Proceedings

### 1. The RCA proceedings

In November 2013, in anticipation of the expiration of the HEA/Chugach lease, HEA filed two tariff letters with the RCA. One — the transmission tariff application — sought "approval of transmission and related ancillary services tariffs" for HEA's contemplated assumption of the S/Q Line's operation. The other — the line loss tariff application — sought compensation for "transmission line losses due to transmitting energy from the [Project]." A number of utilities objected to HEA's choice of forum: Chugach, GVEA, MEA, and ML&P (the Protesting Utilities). They argued

---

[30] *Id.* § 1.

[31] *See* AS 42.05.431.

[32] Ch. 11, § 2, SLA 1988.

that the RCA should reject the tariff filings because they sought to "fundamentally change the rights, obligations, and rates associated with wheeling Project power across the S/Q line." According to the Protesting Utilities, "[t]hose rights, obligations, and rates are defined in the Bradley Lake Agreements," which, along with "any amendments to those agreements, are exempt from Commission review or approval under AS 42.05.431(c)."

In June 2014 the RCA issued Order 10, entered in both the transmission tariff docket and the line loss docket. Order 10 addressed the RCA's authority to decide HEA's tariff applications, the applications' substance, and a number of procedural issues. The RCA prefaced the summary of its findings and conclusions by stating that they were "[b]ased on the record developed so far in these dockets, and only for the purpose of setting interim and refundable inception rates for wheeling Bradley Lake energy from Soldotna Substation to Quartz Creek Substation and for the purpose of denying implementation of HEA's line loss tariff."

The RCA acknowledged that the Bradley Lake Agreements, "and any amendments to them, including future amendments, [were] not to be submitted to us for review or approval before going into effect." But it concluded that the Agreements did not specifically address the effect of the expiration of the HEA/Chugach lease and did not preclude the RCA from setting rates for HEA's subsequent provision of wheeling services from the Soldotna to Quartz Creek Substations over the S/Q Line.

Turning to the substance of the tariff applications, the RCA denied the line loss tariff application on the understanding that the parties had "reached tacit, if not explicit, agreement regarding compensation for Bradley Lake related line losses on the HEA system." It denied HEA's transmission tariff application on grounds that the rates sought were unjust and unreasonable. It further noted, however, that "HEA is currently providing wheeling services for Bradley Lake energy over the SQ Line without

compensation," and it approved an "interim and refundable inception rate for wheeling Bradley Lake energy over the SQ Line" retroactive to January 1, 2014. The RCA conditioned its approval of interim rates on HEA's compliance with certain filing requirements and stated that "[f]urther proceedings [were] necessary . . . to finally determine whether the rates and rules contained in [the transmission tariff application were] just and reasonable." The RCA concluded that "[n]o substantive or procedural matters remain[ed] in [the line loss docket]," closed that docket, and advised the parties of their rights to appeal it as "the final decision in [the line loss docket]."

The Protesting Utilities — Chugach, GVEA, MEA, and ML&P — appealed Order 10 to the superior court.

### 2. The Project Management Committee proceedings

In the meantime the same issues were being considered by the BPMC, the Project Management Committee established under the Bradley Lake Agreements. In December 2013 the BPMC issued a resolution noting the upcoming expiration of the HEA/Chugach lease and HEA's November 2013 tariff filings with the RCA. The BPMC asserted that it had the "primary jurisdiction and authority . . . to resolve" the dispute, urged the interested parties to mediate, and formed a committee to recommend resolutions.

In a May 2014 order the BPMC affirmed its authority over the dispute both because of the dispute-resolution provisions of the Bradley Lake Agreements and because of "the exemption of the Bradley Lake Agreements from any regulatory oversight under AS 42.05.431(c)," which allowed the participants' "rights and responsibilities . . . over electrical facilities and rates . . . to be addressed and resolved by the industry through the specialized experience and expertise of the BPMC." The BPMC then concluded that the Bradley Lake Agreements were not affected by the expiration of the HEA/Chugach Lease and that Chugach was still entitled to wheel Project energy over

the S/Q Line. The BPMC further concluded, however, that while "HEA is adequately compensated under the Bradley Lake Agreements for the use of HEA's system and is entitled to no additional compensation," "in the interest of reaching a resolution . . . , HEA is to receive additional payments from the other Project Participants for the continuing use of HEA's facilities north of the Soldotna Substation throughout the term of the Services Agreement." The BPMC set the payments to include a "fixed component" of $300,000 a year and a "variable component" reflecting HEA's costs of performing the maintenance and repair that the Services Agreement had contractually delegated to Chugach.

### 3. The superior court proceedings

The judicial process was first invoked in April 2014, when AEEC, HEA's transmission affiliate,[33] filed a complaint seeking restitution from Chugach, GVEA, and ML&P for unjust enrichment based on its wheeling of their electricity along the S/Q Line following the lapse of the HEA/Chugach lease. MEA intervened. AEEC amended its complaint to seek not only restitution for unjust enrichment but also declaratory relief, including a declaration that the RCA, "not the BPMC, has jurisdiction to determine just and reasonable rates for the transmission of electric energy across AEEC's transmission system."

With their answer the Protesting Utilities filed a third-party complaint naming HEA and a counterclaim seeking, among other things, a declaration that "the Bradley Lake Agreements and any amendments to those agreements are exempt from the RCA's jurisdiction." They also sought a permanent injunction prohibiting AEEC and HEA from "seeking approval from the RCA of their Tariff Filings as they relate to matters governed by the Bradley Lake Agreements." AEEC and HEA then moved to

---

[33] *See supra* note 3.

stay their suit "pending final resolution of the matters presently pending before the RCA or the granting of a petition for review," noting that "[t]he RCA ha[d] interpreted the scope of its authority and taken jurisdiction over this matter."

When the Protesting Utilities filed their superior court appeal from the RCA's Order 10, the RCA moved to dismiss the appeal on grounds of untimeliness and the lack of an appealable final order. Ultimately the superior court, without ruling on the RCA's motion to dismiss the appeal and over its objection, exercised its discretionary authority under Alaska Civil Rule 42(a) to consolidate the administrative appeal with the AEEC lawsuit for the purpose of litigating "a common question of law": "whether the [RCA] had the authority (i.e., subject matter jurisdiction) to address the issues raised in [the transmission tariff and line loss tariff dockets]." The court stayed other proceedings in both cases pending its decision of the jurisdictional issue. It invited the parties in both cases, including the RCA, to address the jurisdictional issue, and all of the parties, including the RCA, did so.

The superior court issued its order in the consolidated cases in May 2015. It concluded that the "RCA did not have the authority to review or determine the interim rates for wheeling Bradley Lake energy from the Soldotna Substation to the Quartz Creek Substation or to review or determine line loss related to wheeling Bradley Lake energy over HEA's transmission system." The court observed that the Bradley Lake Agreements were signed after the HEA/Chugach lease was already in effect, ostensibly "with [the parties'] full knowledge of the possessory status of the S/Q Line." The court reasoned that unless otherwise agreed, "the termination of a lease does not change the rights and obligations of parties to a separate and unrelated contractual agreement, much less terminate that agreement." It cited the Services Agreement's integration clause: "This Agreement in its entirety reflects the meeting of the minds among the Parties . . . and there exists no agreement among the Parties that services will be provided to the

Wheeling Utilities for Bradley Lake Energy . . . on terms or conditions other than as set forth in this Agreement." The court concluded, "Because the Bradley Lake Agreements are not affected by the lease agreement, RCA is statutorily exempted from resolving disputes that arise from the Bradley Lake energy running across the S/Q Line." The court therefore vacated Order 10, remanded the administrative appeal to the RCA "for clarification consistent with this order," and lifted the stay on further proceedings on AEEC's lawsuit.

The RCA and HEA filed petitions for review, which we granted and converted to appeals because the superior court's order effectively resolved all issues in the administrative appeal. Their challenges center on whether Order 10 was a final, appealable order; whether the superior court properly decided the administrative appeal in the absence of an agency record; and whether the RCA had authority to issue Order 10.

## III.   STANDARD OF REVIEW

"When the superior court acts as an intermediate court of appeal in an administrative matter, we 'independently review and directly scrutinize the merits of the [agency]'s decision.' "[34]   "We exercise our independent judgment on [any] issue concerning the scope of an agency's authority since it involves statutory interpretation, or analysis of legal relationships, about which courts have specialized knowledge and expertise."[35]

---

[34]     *Nw. Med. Imaging, Inc. v. State, Dep't of Revenue*, 151 P.3d 434, 438 (Alaska 2006) (alteration in original) (quoting *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003)).

[35]     *Far N. Sanitation, Inc. v. Alaska Pub. Utils. Comm'n*, 825 P.2d 867, 871 n.6 (Alaska 1992); *see also Nw. Med. Imaging*, 151 P.3d at 438 ("Whether an agency acting in a judicial capacity or the superior court has subject matter jurisdiction is a
(continued...)

Issues of ripeness are subject to de novo review.[36] "Whether an appeal is timely is a question of law,"[37] but a superior court's decision to relax the timeliness rules is reviewed for abuse of discretion.[38]

"Questions of contract interpretation are generally questions of law that will be reviewed de novo."[39]

## IV. DISCUSSION

The RCA and HEA raise several challenges to the superior court's appellate jurisdiction: that Order 10 was not a final, appealable order; that to the extent it was final and appealable the Protesting Utilities' appeal was late; that the superior court erred by ruling on the RCA's jurisdiction without the benefit of the agency record, which had not yet been filed; and that the superior court erred by allowing the Protesting Utilities to submit evidence in support of their jurisdictional arguments that had not been considered by the RCA. We reject these arguments and conclude that the superior court properly exercised its appellate jurisdiction.

On the merits, we also agree with the superior court's conclusion: that the RCA lacked the regulatory authority to issue Order 10.

---

[35]     (...continued)
question of law, subject to de novo review by this court.").

[36]     *State v. Am. Civil Liberties Union*, 204 P.3d 364, 367-68 (Alaska 2009).

[37]     *Griswold v. City of Homer*, 252 P.3d 1020, 1025 (Alaska 2011).

[38]     *See Anderson v. State, Commercial Fisheries Entry Comm'n*, 654 P.2d 1320, 1322 (Alaska 1982).

[39]     *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1000 n.1 (Alaska 2004).

**A.      The Superior Court Had Jurisdiction To Determine The RCA's Authority To Issue Order 10.**

The superior court has appellate jurisdiction over "final orders" of the RCA.[40] Order 10 contained a paragraph designating it as a "Final Order" and setting out the parties' appeal rights, with this qualification:  "This order constitutes the final decision in Docket U-13-204," the line loss docket.  The order did not purport to be the final decision in the transmission docket, and in fact, as explained above, it specifically contemplated further proceedings on HEA's transmission tariff application.

The RCA and HEA accordingly contend that Order 10 was interlocutory and not appealable as to the transmission docket because it did not dispose of the entire case.[41] They further contend that although Order 10 was final as to the line loss docket — denying HEA's line loss tariff application without prejudice and closing that docket on grounds that the parties appeared to have reached agreement — the line loss docket cannot serve as the vehicle for judicial review of the jurisdictional issue because there was no losing party with a reason to appeal, and, in addition, a finding of jurisdiction was not necessary to that part of the order since all it did was deny relief.

In response, the Protesting Utilities point out that their administrative appeal was consolidated with AEEC's lawsuit, in which both sides sought declaratory relief addressing the issue of the RCA's authority to approve rates for wheeling Bradley

---

[40]      *See* AS 22.10.020(d) ("The superior court has jurisdiction in all matters appealed to it from . . . [an] administrative agency when appeal is provided by law. . . ."); AS 42.05.161(a) (providing "that final administrative determinations by the commission are subject to judicial review under [the Administrative Procedure Act, AS 44.62] as provided in AS 42.05.551(a)"); AS 42.05.551(a) ("All final orders of the commission are subject to judicial review in accordance with AS 44.62.560 - 44.62.570.").

[41]      *See Ostman v. State, Commercial Fisheries Entry Comm'n*, 678 P.2d 1323, 1327 (Alaska 1984).

Lake energy over the S/Q Line. The superior court's order was entered in the consolidated cases, and the RCA, though not a party to the AEEC lawsuit, was a party to the consolidated cases by virtue of the appeal and had the same right and opportunity as every other party to brief and argue the essential issue of its regulatory jurisdiction. But the RCA counters that despite consolidation it was a party only to the administrative appeal; that the appeal was invalid for a number of reasons; and that the RCA cannot be bound by a decision that was lawfully entered only in the lawsuit to which it was not a party.

We conclude, however, that the issue of the RCA's jurisdiction was properly decided in both the administrative appeal and the AEEC lawsuit. Even if Order 10 was not a final, appealable order with regard to the transmission docket — an issue we need not decide — it was expressly made a final, appealable order with regard to the line loss docket. The Protesting Utilities appealed from Order 10 without differentiation; their appeal encompassed both dockets. And Order 10 in its entirety was premised on the RCA's authority to issue it.

The RCA began its discussion by stating that its findings and conclusions were "for the purpose of setting interim and refundable inception rates for wheeling Bradley Lake energy from Soldotna Substation to Quartz Creek Substation *and for the purpose of denying implementation of HEA's line loss tariff.*" (Emphasis added.) Its subsequent discussion of its authority repeatedly referenced the line loss tariff as well as the transmission tariff, finding that HEA's filing of the line loss tariff did not violate the Power Sales Agreement but did conflict with requirements of the Capability Agreement and therefore was outside the RCA's authority. Though recognizing the likely resolution of the line loss dispute by "a tacit agreement . . . which appears satisfactory to the parties for line loss compensation to HEA, making [the line loss tariff application] unnecessary,"

the RCA nonetheless found that the application "proposed rates which are unjust and unreasonable in their entirety" and denied interim implementation.

The RCA and HEA contend that the Protesting Utilities cannot properly appeal from an order that gave them "the relief (the denial of the line loss tariff) which they sought below"; they contend that any appeal from Order 10 as it related to the line loss docket was moot. But in Alaska the mootness doctrine "is a matter of judicial policy" and, unlike its federal counterpart, does not act as a limit on jurisdiction.[42] The court had the *jurisdiction* to hear an appeal from the line loss docket even if that appeal could have been properly dismissed as moot. We therefore consider the superior court's decision to rule on the issue of the RCA's authority in the consolidated cases not as an assertion of appellate jurisdiction but as a prudential decision, implicating issues of ripeness and mootness that we review de novo.[43]

It is not reasonably disputed that the issue of the RCA's authority was central to both the AEEC lawsuit and the administrative appeal, that it remained genuinely at issue, and that it was implicated in all proceedings going forward. Nor is it reasonably disputed that all interested parties were before the court in the consolidated cases, and all had the opportunity to be heard on the issue of the RCA's authority. It was

---

[42]    *Bowers Office Prods., Inc. v. Univ. of Alaska*, 755 P.2d 1095, 1096-97 (Alaska 1988); *see also Falcon v. Alaska Pub. Offices Comm'n*, 570 P.2d 469, 474-75 (Alaska 1977) ("Since the requirement of adversity is neither federally mandated nor required by the Alaska Constitution, the court's requirement of adversity as a component of standing is essentially a judicial rule of self-restraint.").

[43]    *See Alaska Cmty. Action on Toxics v. Hartig*, 321 P.3d 360, 366 (Alaska 2014); *see also State v. Am. Civil Liberties Union*, 204 P.3d 364, 367-68 (Alaska 2009) ("[T]his court is the ultimate arbiter of . . . issues [of standing, mootness, and ripeness] and we review de novo a superior court's ripeness determination.").

certainly efficient to decide the issue only once at the superior court level. We thus conclude that the issue was ripe and not moot.[44]

The RCA and HEA contend, however, that the issue should not have been decided *yet*, because the RCA's own decision-making process was ongoing at the agency level; any mistake in its assertion of jurisdiction could "be remedied in the further agency proceedings or on appeal from a final order."[45] HEA points out that the RCA approved only rates that were interim and fully refundable, and its assertion of jurisdiction, if mistaken, could be easily remedied following an appeal in the usual course from a final, appealable order.

But while Order 10's approval of rates was expressly interim, its decision of the RCA's jurisdiction to set those rates was not. The order's relevant conclusions include both (1) that the RCA has authority to establish wheeling rates for the S/Q Line upon expiration of the HEA/Chugach lease and (2) that "[f]urther proceedings are necessary in [the transmission tariff docket] to finally determine whether the rates and rules contained in [HEA's tariff application] are just and reasonable." The Order's discussion of the first issue, the RCA's authority, closely examines AS 42.05.431,

---

[44]    "The requirement of 'ripeness' means there must be 'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Lowell v. Hayes*, 117 P.3d 745, 757 n.61 (Alaska 2005) (quoting *Brause v. State, Dep't of Health & Soc. Servs.*, 21 P.3d 357, 359 (Alaska 2001)). "A claim is moot if there is no 'present, live controversy' or if it is impossible to provide the relief sought." *Alaska Cmty. Action on Toxics*, 321 P.3d at 366 (quoting *Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 776 (Alaska 2001)).

[45]    The RCA's and HEA's challenge to finality is in the context of their argument that Order 10 was not a final, appealable order with regard to the jurisdictional issue. We consider the challenge in what we believe is its proper context: as a challenge to the superior court's prudential decision to consider an issue that may have been moot or not ripe for review.

including its legislative history, as well as the terms of the Bradley Lake Agreements to determine what effect, if any, they may have on the issue. The Order distinguishes the RCA's regulatory authority from the BPMC's contractual dispute-resolution authority. The Order concludes "that wheeling of Bradley Lake energy over the SQ Line is no longer governed by the Bradley Lake Agreements" and that the RCA therefore has "authority to regulate both the terms and rates under which HEA provides this wheeling service." This conclusion — a necessary first step to the next, in which the RCA addresses the merits of HEA's tariff applications — appears final; there is nothing about the discussion that invites or anticipates further proceedings on the issue of the RCA's authority.

In *Alaska Consumer Advocacy Program v. Alaska Public Utilities Commission* (*ACAP*), we reviewed an order allowing a telephone utility to begin collecting "charges for operator assistance with intrastate calls" pending the commission's consideration of a new "rate design" for the utility's intrastate and interstate rates.[46] We held that the order — Order 37 — was "final and appealable because it [was] fully effective and [had] practical consequences."[47] We explained that the order's "effects [were] felt by Alaska consumers" to the extent that consumers were paying "operator assistance charges because of it."[48] We further explained that "[s]ince the challenges [to Order 37 were] procedural and not substantive challenges to the design of the rate, these challenges were as ripe for review on the day the order was entered as they will ever be"; "[s]ubsequent notice and production of evidence in ongoing

---

[46]    793 P.2d 1028, 1031 (Alaska 1990).

[47]    *Id.* at 1032.

[48]    *Id.*

-25-                                                                7338

proceedings could not possibly remedy procedural defects in the promulgation of Order 37."[49]

We conclude that the same rationale applies here. The challenge to the RCA's assertion of jurisdiction for purposes of Order 10 was not a challenge to the interim rates per se, which were subject to modification as the proceedings continued and were refundable if not ultimately sustained. The challenge, rather, was to the RCA's authority to address that subject at all. "Jurisdictional defects deprive the agency of [the] power to adjudicate or regulate the subject matter."[50] Further proceedings in the transmission docket could not possibly remedy the claimed jurisdictional defect; they could only perpetuate it. Thus, the challenge is "as ripe for review" now as it "will ever be."

HEA contends that our decision on this issue should be governed not by *ACAP* but rather by *Far North Sanitation, Inc. v. Alaska Public Utilities Commission*.[51] In that case, a garbage collection company filed an appeal following a final rate determination, challenging not the final order but only an interim order that had been issued 21 months earlier, which the company alleged "was unauthorized and illegal as retroactive ratemaking."[52] The APUC argued that the company waived its right to appeal the interim order because that order had itself been final and thus appealable within 30

---

[49]     *Id.*

[50]     *Far N. Sanitation, Inc. v. Alaska Public Utils. Comm'n*, 825 P.2d 867, 870 (Alaska 1992).

[51]     *Id.*

[52]     *Id.* at 868-69.

days of its issuance.[53]  We observed that "[w]e employ a 'practical' test to determine whether or not an order is a final order," by which we look to whether the order "completely and finally disposes of the contested claims on their merits."[54]  We concluded that the interim order was not a final, appealable order because the commission had given the company "time to submit a tariff advice letter and a revenue requirements study in support of its rates."[55]

This case is fundamentally different from *Far North Sanitation* in that here there indisputably *was* a final, appealable order, though limited to one docket.  The question is whether the judicial policies of ripeness or mootness should have prevented the superior court from deciding the issue of the RCA's jurisdiction in the context of that appeal, when properly consolidated with an original lawsuit seeking an answer to the same question.  We conclude that under the unique circumstances of this case it was proper for the superior court to decide the jurisdictional issue when it did.

## B. Other Alleged Procedural Deficiencies Do Not Affect The Validity Of The Superior Court Appeal.

The RCA and HEA also contend that the superior court erred by deciding the appeal before the agency record had been prepared and by allowing the parties to submit affidavits and other materials in support of their jurisdictional arguments that had not first been presented to the RCA.  They rely on AS 22.10.020(d), which provides that "hearings on appeal from a final order or judgment of [an] . . . administrative agency . . . shall be on the record unless the superior court, in its discretion, grants a trial de novo,

---

[53]    *Id.* at 869.

[54]    *Id.* at 869-70 (quoting *Mukluk Freight Lines, Inc. v. Nabors Alaska Drilling, Inc.*, 516 P.2d 408, 411 (Alaska 1973)).

[55]    *Id.* at 870.

in whole or in part," and on the Appellate Rules, which define the record on appeal as "the original papers and exhibits filed with the administrative agency."[56] HEA identifies "five affidavits with 486 pages of sworn statements and exhibits" that the Protesting Utilities submitted "in support of their jurisdictional brief," only part of which had been submitted to the RCA.

But the parties to the AEEC lawsuit, an original action, were not constrained by the rules relating to an agency record on appeal. The superior court allowed them to submit documentary evidence regardless of whether it was in the agency record; presumably it would have allowed the RCA and HEA to do the same. And neither the RCA nor HEA points to any relevant evidence in the agency record that they lacked the opportunity to present in support of their own jurisdictional briefing. Furthermore, even if the superior court had erred in its consideration of evidence, it would not affect our review, which considers the agency decision de novo.[57]

HEA also argues that the Protesting Utilities' appeal from Order 10 was untimely because it was filed more than 30 days after the order was distributed. The Protesting Utilities counter that the petition for reconsideration HEA filed with the RCA tolled the time for appeal,[58] but HEA contends that because the petition for reconsideration addressed only Order 10's discussion of the transmission tariff docket,

---

[56] Alaska R. App. P. 604(b)(1)(A).

[57] *Nw. Med. Imaging, Inc. v. State, Dep't of Revenue*, 151 P.3d 434, 438 (Alaska 2006). We note that our own analysis of the jurisdictional issue, *infra* Section C, cites no evidence presented only in the superior court.

[58] "If a request for agency reconsideration is timely filed before the agency, the notice of appeal must be filed within 30 days after the date the agency's reconsideration decision is mailed or otherwise distributed to the appellant, or after the date the request for reconsideration is deemed denied under agency regulations[,] whichever is earlier." Alaska R. App. P. 602(a)(2).

it failed to toll the time for appealing Order 10 as it related to the line loss tariff docket. We reject HEA's contention that Order 10 was two orders for purposes of calculating the effect of reconsideration on the time for appeal.[59] But even if we accepted that argument, we would not conclude that the superior court abused its discretion by relaxing the 30-day deadline, given the case's unusual procedural posture and HEA's failure to allege, let alone demonstrate, that it suffered any prejudice from an appeal it claims was filed 23 days late.[60]

## C. By Contract And Statute, The RCA Lacks Authority To Regulate Wheeling Rates For Bradley Lake Energy Over The S/Q Line.

No party disputes that until January 1, 2014, the rates for Chugach's wheeling services of Bradley Lake energy over the S/Q Line were set by the Services Agreement. The substantive jurisdictional question before us is whether, upon the expiration of the HEA/Chugach lease for the Soldotna Substation, authority to set those wheeling rates reverted to the RCA. We conclude that such a reading of the Bradley Lake Agreements, and of the legislation insulating them from regulatory overview, would be contrary to the obvious intent of the Agreements and the statute.

---

[59] *See Richter v. Richter*, 330 P.3d 934, 937 n.2 (Alaska 2014) (rejecting argument that motions for reconsideration and new trial "did not affect the time for appealing the jurisdiction issue because they did not address it," because "Rule 204(a)(3) does not extend the time for appealing only those issues that are addressed in post-trial motions; such a rule would needlessly foster piecemeal appeals").

[60] *See Anderson v. State, Commercial Fisheries Entry Comm'n*, 654 P.2d 1320, 1322 (Alaska 1982) (finding abuse of discretion in superior court's failure to relax 30-day time limit for appeal when appellant had "far from untenable" position that he was entitled to move for reconsideration before appealing, "[t]he agency ha[d] made no showing that the minimal (seventeen day) delay worked to its disadvantage," and the consequences of denying an appeal were "severe").

**1. The parties intended the Services Agreement to govern the rates for wheeling Bradley Lake energy over the S/Q Line.**

The Agreements are clear about their intent. The "whereas" clauses prefacing the Services Agreement lay out the parties' expectation that the State will someday finance construction of an intertie allowing transmission of Bradley Lake energy to the railbelt utilities; meanwhile, they need "some alternative solution to the problem of transmitting or otherwise utilizing Project power." That "alternative solution," they agree, is contained in the Services Agreement. The Services Agreement contemplates that Chugach will wheel the other utilities' energy north from the Soldotna Substation, and it provides that "[t]he applicable wheeling rates shall be established initially, and shall be changed from time to time, *only in accordance with the provisions of Appendix A attached hereto*." (Emphasis added.) The Agreement makes no mention of the HEA/Chugach lease, nor does it contemplate an alternative plan in case the lease is terminated. Indeed, in the Services Agreement the parties (including HEA) agree that "[t]his Agreement in its entirety reflects the meeting of the minds among the Parties, . . . and there exists no agreement among the Parties *that services will be provided to the Wheeling Utilities for Bradley Lake Energy . . . on terms or conditions other than as set forth in this Agreement*." (Emphasis added.) The parties' rights and obligations last for the Service Agreement's term: 50 years from the date the Project began commercial operation, unless the Project itself is terminated or the parties invoke other contractual processes, not relevant here, for early termination.

The RCA's conclusion that HEA's tariff applications did not seek to modify the Services Agreement relied on its definition of "Soldotna Substation," which is: "The Soldotna Substation owned and operated by Homer Electric Association, Inc., *or any successor facility* at which Bradley Lake Energy can be and is delivered to Chugach at Chugach's metering point by a Wheeling Utility for services under this Agreement."

(Emphasis added.) The RCA noted the parties' conflicting interpretations of this provision: HEA relied on it "to argue that changing the delivery point from HEA's Soldotna Substation to Chugach's Quartz Creek Substation is not a modification of the Services Agreement," whereas the Protesting Utilities asserted "that the 'successor facility' language in the Services Agreement was meant only to incorporate movement of the delivery point from Soldotna Substation to the southern terminus of the proposed Southern Intertie." The RCA rejected the Protesting Utilities' argument, explaining that when the Services Agreement was being negotiated, the prospects for funding the southern intertie in the near future were dim, and it was unlikely to have played a prominent part in the parties' expectations. The RCA therefore found "that the successor facility language was intended to cover circumstances where a Wheeling Utility delivered its share of Bradley Lake energy to Chugach at a Chugach metering point other than HEA's Soldotna Substation." Because Chugach could no longer accept delivery at the Soldotna Substation, the "successor facility" was necessarily "its metering point in Quartz Creek Substation." And because moving the delivery point from Soldotna Substation to a "successor facility" was specifically contemplated by the Services Agreement, HEA's tariff application for imposing new wheeling rates on the S/Q Line was consistent with the Agreement rather than an attempt to amend it.

We consider the RCA's conclusion to be somewhat beside the point, given the obvious purpose of the Agreements and the legislation — to remove the transmission pathway from the RCA's rate-setting authority. Whether Chugach moved its metering point for Bradley Lake deliveries to Quartz Creek or another point north would not change the fact that the purchasing utilities needed to have their Bradley Lake energy wheeled across the S/Q Line and had agreed to a formula for setting those wheeling rates in the Services Agreement.

Moreover, we do not find the RCA's interpretation of the Services Agreement persuasive. The Agreement does not explain how a "successor facility" is designated, but there is nothing to suggest that the designation may occur without the consent of the affected wheeling utility. Under the RCA's interpretation, Chugach could next surrender its Quartz Creek Substation to another entity, moving its delivery point another step north and again prompting a change in rates as the new owner of Quartz Creek Substation filed a tariff application for wheeling services — services that, under the RCA's interpretation, might no longer be covered by the Services Agreement. We note also that the Services Agreement specifically allows the parties to renegotiate their contract five years after the start of commercial production and "*by unanimous agreement* select an entity other than Chugach . . . to dispatch generation of the Project," (emphasis added) after which the terms and conditions for providing those services may be changed, but only through negotiation and amendment. The Bradley Lake Agreements evidence an intent throughout that significant changes to the status quo will be agreed to by the affected participants or submitted to the BPMC for decision.

Like the superior court, we conclude that the Bradley Lake Agreements clearly demonstrate the parties' intent to restrict the setting of wheeling rates along the S/Q line to the schedule set in the Services Agreement and therefore to exclude it from the RCA's jurisdiction. There is nothing in the Agreements to indicate that the expiration of the HEA/Chugach lease would change this fundamental understanding.

**2. The governing statute precludes RCA authority over rate-setting for the wheeling of Bradley Lake energy over the S/Q Line.**

Alaska Statute 42.05.431(a) undoubtedly grants authority to the RCA to establish "just and reasonable rate[s]" for services that are "subject to the jurisdiction of the commission." Subsection (b) of the same statute provides that "[a] wholesale power

agreement between public utilities is subject to advance approval of the commission."[61] Subsection (c) — added to the statute specifically to address the Bradley Lake Agreements — begins, "[n]otwithstanding (b) of this section," and it identifies agreements that are *not* subject to RCA review, at least for a time. Wholesale power agreements "for the sale of power from a project licensed by [FERC] on or before January 1, 1987," as well as related energy contracts and amendments, "are not subject to review or approval by the commission until all long-term debt incurred for the project is retired."[62]

The parties do not dispute that "all long-term debt incurred for the [Bradley Lake Project]" has not yet been retired, nor do they argue that the Services Agreement is not a "related contract" that falls within the statute's exclusion from RCA jurisdiction. The import of this express statutory language is reinforced by the legislative history described above. Because of its concerns with regulatory delay, satisfying bondholders, and minimizing the cost to ratepayers, the legislature intended that rate-setting for the wheeling of Bradley Lake energy from the Project to the railbelt utilities — a path that necessarily includes the S/Q Line — was not subject to RCA review but rather entrusted to the participants' contractual dispute-resolution process, primarily the BPMC.

In Order 10, the RCA cited AS 42.05.431(e) in support of its jurisdiction, concluding that the final sentence, "which prohibits [the RCA] from altering or amending the cost of service formulas established in the Bradley Lake Agreements[,] . . . would not be required if [the RCA] were prohibited by AS 42.05.431(c) from reviewing the Bradley Lake Agreements for any purpose." In response MEA cites to legislative testimony by Roger Kemppel, a utilities lawyer, who explained to the House Finance

---

[61]     AS 42.05.431(b).

[62]     AS 42.05.431(c)(1).

Committee that subsection (e) was intended to ensure that utilities in rate proceedings before the APUC would be allowed to include in those rates the "[v]alidated costs incurred . . . in connection with the related contracts."[63]  As an example, Kemppel explained that if GVEA "is in on a rate hearing" and "[i]t's paying certain wheeling cost[s] to Chugach," those costs "should be allowed in the [GVEA] rate case" without being subject to APUC approval.[64]  MEA's explanation is persuasive; the testimony shows that subsection (e) was intended to emphasize rather than minimize the limitations on regulatory review.

We conclude that AS 42.05.431(c) was intended to preclude the RCA from asserting jurisdiction over rates for services that were covered by the Bradley Lake Agreements.  Since wheeling services over the S/Q Line are governed by the Agreements, the RCA's assertion of jurisdiction over the tariff applications at issue on this appeal was contrary to the statute and therefore unlawful.

## V.    CONCLUSION

We AFFIRM the superior court's decision reversing the RCA's Order 10.[65]

---

[63]    Hearing on H.B. 356 Before the House Fin. Comm., 15th Leg., 2d Sess. (Feb. 5, 1988) (testimony of Roger Kemppel, Gen. Counsel, Alaska Rural Elec. Coop. Ass'n).

[64]    *Id.*

[65]    We do not consider the RCA's authority over joint-use agreements under AS 42.05.321 as an alternative basis for jurisdiction because it was not raised in the superior court. *See Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1083 n.88 (Alaska 2009) ("Issues that are not raised in the superior court are waived and cannot be asserted on appeal as grounds for overturning a judgment." (quoting *Still v. Cunningham*, 94 P.3d 1104, 1111 (Alaska 2004))).