**MUNICIPALITY OF ANCHORAGE d/b/a Anchorage Water & Wastewater Utility, Appellant,**

v.

**REGULATORY COMMISSION OF ALASKA, and the Attorney General for the State of Alaska, Appellees.**

No. S–12788.

Supreme Court of Alaska.

Sept. 4, 2009.

---

**328**

Heather H. Grahame, Dorsey & Whitney LLP and James N. Reeves, Municipal Attorney, Anchorage, for Appellant.

Robert Stoller, Assistant Attorney General, and Steve DeVries, Assistant Attorney General, Anchorage, Talis J. Colberg, Attorney General, Juneau, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

The Municipality of Anchorage, doing business as Anchorage Water and Wastewater Utility (AWWU), operates a public utility providing water and sewage services in Anchorage. Because AWWU is a regulated utility, the Regulatory Commission of Alaska (RCA) must approve any rate changes AWWU proposes.[1] In 2003 the Municipality changed its regulations regarding payment in lieu of property taxes, and in 2004 AWWU applied for a rate change to cover the increased costs. RCA denied approval of AWWU's proposed rate increases. The superior court affirmed RCA's decision on intermediate appeal. Because there is no reasonable basis in the record for RCA's ruling, we reverse the superior court's decision and remand for further proceedings by RCA.

## II. FACTS AND PROCEEDINGS

### A. Rate–Setting Background

Setting the rates a utility may charge its customers is a two-step process. RCA first determines a utility's "revenue requirement," the amount of annual revenue a regulated utility needs to pay its operating expenses and to generate a reasonable return on investment.[2] RCA then determines the rates a utility may charge to generate that amount of revenue.[3]

When calculating the revenue requirement, property taxes are accounted for as operating expenses.[4] Property taxes fund municipal services such as police and fire protection. Public utilities benefit from these municipal services but do not pay property taxes. A municipality may require public utilities to make "payments in lieu of property taxes" to contribute to the cost of municipal services. Reasonably calculated payments in lieu of taxes are also considered operating expenses when calculating the revenue requirement.[5] RCA closely scrutinizes such payments as transactions between affili-

---

1. AS 42.05.141(1).

2. AS 42.05.141(a)(1)-(3); *Re Alaska Elec. Light & Power Co.*, 4 A.P.U.C. 352, 353 (Alaska Pub. Util. Comm'n 1982) (Docket U–81–44, Order No. 5).

3. *Re Alaska Elec. Light & Power Co.*, 4 A.P.U.C. at 353–54 (Docket U–81–44, Order No. 5 at 2–3).

4. *Id.* at 354; CHARLES F. PHILLIPS, JR., THE REGULATION OF PUBLIC UTILITIES 259–260 (Public Utilities Reports, Inc.1993).

5. *See, e.g., Re Mun. of Anchorage d/b/a Anchorage Tel. Util.*, 2 A.P.U.C. 22, 24–28 (Alaska Pub. Util. Comm'n 1977) (Docket U–76–6, Order No. 12 at 3, 6).

ated interests.[6]

## B. Facts

In 1976 the Municipality passed an ordinance requiring its public utilities to make a payment in lieu of taxes known as a Municipality Utilities Service Assessment (MUSA). The MUSA payment was calculated as a percentage of the assessed value of utility assets, called "plant." There are two categories of plant: "non-contributed plant" is acquired at some cost to a utility; "contributed plant" is donated or acquired through grants from federal, state, or private sources, requiring no initial investment of capital by the utility. Under the 1976 ordinance the assessed value of both contributed and non-contributed plant was used to calculate the MUSA payment.

From 1976 to 1987 RCA's predecessor, the Alaska Public Utilities Commission (APUC), approved the Municipality's MUSA charges as legitimate operating expenses for AWWU's component utilities.[7] In other words, APUC set AWWU's rates at a level that allowed AWWU to recoup the MUSA payment cost.[8]

In 1988 the Municipality changed its MUSA ordinance. The 1988 ordinance provided for a MUSA payment based on (1) a percentage of the assessed value of only non-contributed plant and (2) a gross receipts tax (similar to a sales tax). APUC allowed the non-contributed plant assessment portion of the MUSA payment to be computed in AWWU's revenue requirement, but determined that the gross receipts tax portion of payment functioned not as an operating expense, but rather as a dividend to the Munic-

ipality.[9] Dividends, unlike operating expenses, are not recoverable from consumers through utility rate adjustments.[10] APUC thus prohibited AWWU from increasing utility rates to recover any gross receipts tax payments to the Municipality.[11] The Municipality apparently understood this to mean it could not collect the gross receipts tax from AWWU, and never did so.

From 1988 to 2003 AWWU made a MUSA payment to the Municipality based only on the assessed value of non-contributed plant. Under that arrangement AWWU made substantially smaller MUSA payments than it would have if either (1) the 1976 ordinance had remained in effect or (2) the 1988 ordinance had gone into effect with the gross receipts tax component included.

In 2003 the Municipality passed an ordinance reinstating the 1976–1987 method of MUSA calculations—that is, MUSA payments were again to be based on the assessed value of both contributed and non-contributed plant. The Municipality claimed the change was necessary to address AWWU's "substantial underpayments" from 1988 to 2003.

## C. Proceedings

In 2004 AWWU filed a request with RCA to raise its revenue requirement, and therefore its utility rates; about six million dollars of the request was intended to cover its increased MUSA payment to the Municipality. By statute RCA must ensure that public utility rates are "just and reasonable," [12] and in 2005 RCA decided that allowing AWWU to increase its rates to cover the larger

---

**6.** *Re Filing of Tariff Provisions, Mun. of Anchorage d/b/a Anchorage Tel. Util.* (hereinafter *Tariff Provisions* ), Docket U–88–18, Order No. 14 at 46 (Alaska Pub. Util. Comm'n 1989) (citing AS 42.05.511(c) ).

**7.** *See, e.g., Re Mun. of Anchorage d/b/a Anchorage Sewer Util.,* 7 A.P.U.C. 490, 500 (Alaska Pub. Util. Comm'n 1986) (Docket U–83–100, Order No. 25 at 10).

**8.** When we refer to APUC or RCA as "approving" a MUSA, we mean it in the sense used here—that the MUSA paid by a utility to the municipality is an operating expense included in that utility's revenue requirement. A MUSA pay-

ment not approved by RCA, and therefore not recouped by the utility through its rate charges, would effectively reduce the utility's return on investment.

**9.** *Re Investigation of the Reasonableness of the Mun. Util. Serv. Assessment* (hereinafter *Reasonableness* ), Docket U–89–1, Order No. 2 at 6–7 (Alaska Pub. Util. Comm'n 1989).

**10.** *Id.*

**11.** *Id.*

**12.** AS 42.05.381(a); AS 42.05.431(a).

MUSA payment would be unjust and unreasonable. RCA gave three reasons for its decision.

First, RCA stated that two APUC decisions from 1989 required denial of AWWU's request. In the *Tariff Provisions* case APUC ruled that the costs of excess capacity plant—plant not actually being used to provide utility services—could not be recovered from consumers through utility charges.[13] In the *Reasonableness of the MUSA* case APUC approved as reasonable the non-contributed plant portion of the Municipality's 1988 MUSA.[14] RCA interpreted these two decisions as controlling precedents requiring rejection of AWWU's current rate change request.

Second, RCA rejected AWWU's argument that including MUSA payments on contributed plant in AWWU's revenue requirement was reasonable because the MUSA payment is analogous to private utilities' payments of property taxes on contributed plant. RCA implied—but did not explicitly find—that AWWU had failed to prove that private utilities actually pay taxes to the Municipality on contributed plant.

Third, RCA stated that because the proposed rate increase would not be accompanied by increased utility services, it "bears the characteristics of a dividend to the Municipality." In other words RCA viewed AWWU's increased MUSA payment to the Municipality not as a legitimate business expense, but rather as an unwarranted transfer of money to the Municipality from AWWU and ultimately from consumers paying higher utility rates.

AWWU appealed RCA's decision to the superior court. In June 2007 the superior court affirmed RCA's decision, applying the "reasonable basis" standard of review and determining that each of RCA's three rationales was reasonable. AWWU now appeals the superior court's decision.

## III. STANDARD OF REVIEW

 "When the superior court acts as an intermediate court of appeal in an administrative matter, we independently review and directly scrutinize the merits of the [agency's] decision" without giving deference to the superior court's decision.[15] We apply a deferential "reasonable basis" standard to conclusions of law involving the agency's expertise, specialized knowledge, or fundamental policy.[16] Otherwise conclusions of law are reviewed under the "substitution of judgment" standard, and "we 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.'"[17]

## IV. DISCUSSION

### A. RCA's Interpretation of APUC Decisions

Even assuming an agency's interpretation of its own prior decisions involves the agency's expertise, specialized knowledge, or fundamental policy considerations, RCA's conclusion that the two 1989 APUC decisions were binding precedents requiring the denial of AWWU's rate increase request fails the deferential reasonable basis standard. Both decisions involved factual circumstances facially distinct from AWWU's current request. The validity of a MUSA payment on contributed plant was not an issue before APUC in either of those decisions.

The *Tariff Provisions* decision involved excess capacity plant, or plant not actually being used to provide consumers utility services.[18] APUC determined that the utility should not be able to recover the cost of

---

13. *Tariff Provisions, supra* note 6, at 47.

14. *Reasonableness, supra* note 9, at 4.

15. *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003) (citing *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000); *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

16. *Rose v. Comm'l Fisheries Entry Comm'n*, 647 P.2d 154, 161 (Alaska 1982); *see also Jager v. State*, 537 P.2d 1100, 1107–08 (Alaska 1975) (applying "reasonable basis" standard of review to APUC's decision not to investigate a complaint of rate discrimination in gas utility's rate schedule).

17. *Alyeska Pipeline Serv. Co.*, 77 P.3d at 1231 (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

18. *Tariff Provisions, supra* note 6, at 7–13, 47.

acquiring excess assets that "are not used and useful." [19] AWWU's current request involves MUSA payments for plant that *is* "used and useful," not for excess plant.

The *Reasonableness of the MUSA* decision concerned the Municipality's 1988 changes to MUSA calculations.[20] The Municipality changed the MUSA from a payment based on valuations of both contributed and non-contributed plant to a payment based only on the value of non-contributed plant, plus a tax on gross receipts.[21] APUC approved the calculation change that excluded contributed plant, but rejected the gross receipts payment as "unreasonable."[22] APUC determined that a MUSA payment calculated on the value of non-contributed plant is reasonable, but that determination did not necessarily imply that a MUSA payment calculated partly on contributed plant would be unreasonable. RCA's decision conflated those two separate conclusions and ignored APUC's prior approval of MUSA payments based on both contributed and non-contributed plant.

The 1989 APUC decisions are not binding precedents controlling the determination of AWWU's current rate request, and in fact have no bearing on the rate request at all. RCA's reliance on them to deny AWWU's current rate request was therefore unreasonable.

## B. RCA's Rejection of AWWU's Tax Equity Rationale

■ In its *Reasonableness of the MUSA* decision APUC noted that although a MUSA payment is "not calculated exactly the same as the property tax payments by private utilities, there is no requirement that the two types of utilities be treated identically."[23]

But the decision also noted that "address[ing] a potential inequity ... between Municipal and private utilities" weighed in favor of a change in MUSA calculation.[24]

AWWU presented records of two utility companies and a letter from a third, all purporting to show that property taxes are assessed on private utilities' property, whether contributed or non-contributed. AWWU's evidence was countered by confidential records appearing to show that the Municipality allowed two private utility companies to exclude contributed plant from their tax assessments.[25]

RCA did not address the factual evidence submitted by the parties. Without deciding whether private utilities pay taxes on contributed plant, or whether an increased MUSA payment would result in more equity between private utilities and AWWU, RCA rejected the tax equity argument because the Municipality and AWWU had argued *for* the exclusion of contributed plant while defending the 1988 MUSA ordinance, also on tax equity grounds. However RCA ignored the fact that the 1988 MUSA ordinance also contained a gross receipts tax component, which APUC rejected. The Municipality's position on the current MUSA's potential to further tax equity is therefore not necessarily inconsistent with its position on the 1988 MUSA.

We observe that private utilities must pay property taxes on their contributed plant. Article IX, section 4 of the Alaska Constitution states that tax exemptions may be granted "by general law."[26] The legislature has limited municipal authority to exempt property from local taxes by listing classes of property which must or may be exempted.[27] Donated property is not one of those

---

19. *Id.* at 9.

20. *Reasonableness, supra* note 9 at 2.

21. *Id.*

22. *Id.* at 4–7.

23. *Id.* at 4.

24. *Id.* at 4–5.

25. We say "appearing to show" because some pages contained handwritten adjustments, and

because ownership of the contributed plant was disputed or unclear.

26. According to article XII, section 11, "by law" means by the Alaska Legislature.

27. AS 29.45.030, .050.; *see also* Anchorage Mun. Code 12.15.010 (providing that "real property not exempt under the constitution or laws of the state or the ordinances of the municipality is subject to taxation").

classes.[28] The Anchorage Municipal Code likewise does not exempt donated property from taxation.[29] Because RCA inappropriately relied on the arguments from the 1988 MUSA modification rather than acknowledging the statutory requirements for taxation and addressing the merits of the Municipality's and AWWU's tax equity arguments in light of the current facts and circumstances,[30] we hold RCA's decision lacked a reasonable basis.

## C. RCA's Determination that the Increased MUSA Bears the Characteristics of a Dividend

RCA noted that AWWU was proposing a significant rate increase to pay for the higher MUSA and concluded that because the increase in the MUSA payment was not accompanied by provision of more municipal services, the MUSA had the characteristics of a dividend not recoverable through consumer rates. RCA's language implies that an increase in MUSA is not justified without a commensurate increase in the provision of municipal services. That standard problematically leaves no room for a municipality to adjust a MUSA that is set too low or, by extension, to establish a MUSA for the first time.

It is plausible that the Municipality is attempting to put a halt to fifteen years of insufficient MUSA payments and to put future MUSA payments more on par with payments by private taxpayers. It also is plausible that after considering all of the relevant evidence under the appropriate analytical framework,[31] RCA still might properly conclude that AWWU's increased MUSA obligations are like a dividend and may not be funded by an increase in utility rates.[32] But RCA acted unreasonably in calling the increased MUSA a dividend without making factual findings to support that conclusion, especially in light of the fact that APUC had approved the same MUSA formula for eleven years after it was first instituted in 1976.

## V. CONCLUSION

Because RCA: (1) unreasonably believed that its decision was controlled by 1989 APUC precedents; (2) unreasonably failed to consider applicable tax law and evidence on whether private utilities pay property taxes on contributed plant; and (3) unreasonably concluded without sufficient factual findings that the proposed 2003 MUSA payment had the characteristics of a dividend, we hold RCA's denial of AWWU's rate request lacked a reasonable basis. We therefore REVERSE the superior court's decision affirming RCA's denial of AWWU's request for a rate increase. We REMAND for RCA to conduct further proceedings, reopening the evidentiary record if reasonably necessary in

**28.** *See* AS 29.45.030, .050.

**29.** Anchorage Mun.Code 12.15.010, .015.

**30.** It seems logical that tax equity may be an important but not necessarily dispositive factor in finding a rate increase reasonable; increased rates may be reasonable even without a tax equity rationale or unreasonable even with a tax equity rationale.

**31.** RCA points to seemingly relevant statutes describing the burden on AWWU to prove its case, while AWWU argues that those statutes cannot reasonably be applied in this context.

AS 42.05.511(c) states in relevant part:
In a rate proceeding the utility involved has the burden of proving that any ... arrangement it may have with any of its affiliated interests for the furnishing of any services ... is necessary and consistent with the public interest and that the payment made ... is reasonably based, in part, upon the submission of satisfactory proof as to the cost to the affili-

ated interest of furnishing the service ... and, in part, upon the estimated cost the utility would have incurred if it furnished the service ... with its own personnel and capital.
AS 42.05.144(c) states in relevant part:
For rate-making purposes ... payments by a regulated public utility to a person having an ownership interest of more than 70 percent in the utility shall be considered to be ownership equity, profits, or dividends except to the extent that there is a clear and convincing showing that
(1) the indebtedness was incurred, or the payments made, for goods or services that were reasonably necessary for the operation of the utility; and
(2) the goods or services were provided at a cost that was competitive with the price at which they could have been obtained from a person having no ownership interest.
We do not reach the interpretation of these statutes or their application to this case.

**32.** *See Reasonableness, supra* note 9 at 6–7.

light of our opinion, and to make a determination on the merits of the reasonableness of AWWU's proposed rate increase.

Before: CARPENETI, Chief Justice, EASTAUGH, FABE, and WINFREE, Justice, and MATTHEWS, Senior Justice.*

### Order

Motion for Clarification

Date of Order: September 4, 2009

On consideration of the Motion for Clarification filed on May 18, 2009, and the Limited Opposition filed on May 28, 2009,

**IT IS ORDERED:**

1. The Motion for Clarification is GRANTED. The text of the court's opinion has been modified to address the issues raised in the motion.

2. Opinion No. 6371 issued on May 8, 2009, is WITHDRAWN.

3. Opinion No. 6408 is issued on September 4, 2009, in its place, reflecting the modifications to the opinion.

Entered by direction of the court.

* Sitting pro tem by special order of the Chief Justice.