NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| GOLDEN HEART UTILITIES, INC. and COLLEGE UTILITIES CORPORATION, ) | Supreme Court No. S-18624 |
| Appellants, ) | Superior Court No. 3AN-21-06152 CI |
| v. ) | MEMORANDUM OPINION AND JUDGMENT[*] |
| REGULATORY COMMISSION OF ALASKA; OFFICE OF THE ATTORNEY GENERAL, REGULATORY AFFAIRS & PUBLIC ADVOCACY SECTION; GREATER FAIRBANKS COMMUNITY HOSPITAL FOUNDATION, INC.; FOUNDATION HEALTH, LLC; JL PROPERTIES, INC.; FOUNTAINHEAD DEVELOPMENT, INC.; TIMMONS & LARSON, INC.; MV INVESTMENTS LLC; ALASKA ESPRESSO DISTRIBUTORS, LLC, d/b/a Sunrise Bagel & Espresso; PACIFIC RIM ASSOCIATES I, INC., d/b/a Clarion Hotel & Suites; H2O 2U LLC, d/b/a Water Wagon; and UNIVERSITY OF ALASKA FAIRBANKS, ) | No. 2043 – August 28, 2024 |
| Appellees. ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

---

[*]    Entered under Alaska Appellate Rule 214.

Appearances: Dean D. Thompson and Jonathon D. Green, Kemppel, Huffman, and Ellis, P.C., Anchorage, for Appellants. Laura Fox, Senior Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee Regulatory Commission of Alaska. Deborah J. Stojak, Senior Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee Office of the Attorney General, Regulatory Affairs & Public Advocacy Section. Notice of nonparticipation filed by John Foster Wallace, Zimmerman & Wallace, Fairbanks, for Appellee H2O 2U, LLC, d/b/a Water Wagon; and by Matthew Cooper, University of Alaska, Office of the General Counsel, Fairbanks, for Appellee University of Alaska Fairbanks. No appearance by Appellees Greater Fairbanks Community Hospital Foundation, Inc.; Foundation Health, LLC; JL Properties, Inc.; Fountainhead Development, Inc.; Timmons & Larson, Inc.; MV Investments LLC; Alaska Espresso Distributors, LLC, d/b/a Sunrise Bagel & Espresso; and Pacific Rim Associates I, Inc., d/b/a Clarion Hotel & Suites.

Before: Maassen, Chief Justice, and Borghesan, Henderson, and Pate, Justices. [Carney, Justice, not participating.]

## I.    INTRODUCTION

Two affiliated public utility companies filed proposals with the Regulatory Commission of Alaska (RCA) for both interim and permanent rate increases. The RCA approved the companies' proposed interim rates, but required the companies to choose between two options to protect customers who might later be entitled to refunds on those rates. The RCA then conducted an adjudicative proceeding and approved permanent rates that were lower than the rates the companies proposed. The companies appealed to the superior court, arguing that some of the agency's decisions lacked a reasonable basis, the resulting rates were confiscatory, and the order requiring them to choose between two options for handling potential refunds to customers was illegal. The court affirmed the RCA's decisions in full.

The companies appeal to us, renewing arguments they raised in the superior court. We conclude that the RCA had a reasonable basis for its ratemaking decisions and the resulting rates were not confiscatory. The companies also failed to preserve their objection to, or identify any plain error in, the RCA's order regarding interim rate refund. Thus we affirm the court's judgment in favor of the RCA.

## II.     FACTS AND PROCEEDINGS

### A.     Background Facts

Golden Heart Utilities, Inc. and College Utilities Corporation (GHU/CUC) are public utility companies that provide water and wastewater services in and around Fairbanks.[1] The companies operate together under "postage stamp rates," meaning that each of their customers pays the same rate per unit of service as other customers in the same "customer class,"[2] regardless of which company provides the service and how much that service costs the companies.[3] Because GHU/CUC are public utilities, the rates they charge for services are subject to approval by the RCA.[4]

---

[1]      GHU/CUC are both wholly owned subsidiaries of Fairbanks Sewer & Water, Inc.

[2]      The companies organize customers into classes based on the type of service provided and the number of meters used; for example, "Multiple Residential Metered" customers belong to one class, while "Commercial Metered" customers belong to another.

[3]      *See Tlingit-Haida Reg'l Elec. Auth. v. State*, 15 P.3d 754, 763 n.21 (Alaska 2001) ("A postage stamp rate structure charges all customers the same rate regardless of the associated cost of serving them.").

[4]      *See* AS 42.05.361(a) ("Under regulations the [RCA] shall adopt, every public utility shall file with the [RCA] . . . its complete tariff showing all rates . . . ."); AS 42.05.381(a) ("All rates demanded or received by a public utility, or by any two or more public utilities jointly, . . . shall be just and reasonable . . . ."); AS 42.05.431(a) ("When the [RCA], after an investigation and hearing, finds that a rate demanded, observed, charged, or collected by a public utility . . . is unjust, unreasonable, unduly discriminatory or preferential, the [RCA] shall determine a just and reasonable rate . . . to be observed or allowed and shall establish it by order.").

## B.    Proceedings Before The RCA

In May 2019 GHU/CUC filed proposed new rates with the RCA, seeking permanent rate increases of approximately 16.6% for their water services and 18.1% for their wastewater services.[5]  They also requested that the RCA allow interim rate increases of 10.5% for their water services and 12% for their wastewater services if it decided further investigation was necessary to evaluate the companies' proposed permanent rate increases.

The RCA issued an order (Order 1) granting GHU/CUC's requests for interim rate increases and opening administrative dockets to consider whether to grant their requests for permanent rate increases.[6]  The agency required the companies to either place the revenue they received as a result of the interim rate increases in escrow or pay the maximum statutory interest rate of 10.5% per year on any refunds owed to

---

[5]    *See* AS 42.05.411(a) ("A public utility may not establish or place in effect any new or revised rates, charges, rules, regulations, conditions of service or practices except after 45 days' notice to the [RCA] and 30 days' notice to the public.  Notice shall be given to the [RCA] by filing with the [RCA] and keeping open for public inspection the revised tariff provisions which shall plainly indicate the changes to be made in the schedules then in force and the time when the changes will go into effect."); AS 42.05.361(a)-(b), .411(b) (stating requirements for rate-change filings); 3 Alaska Administrative Code (AAC) 48.275 (same).

[6]    *In re Golden Heart Utils., Inc.*, RCA Nos. U-19-070(1)/071(1), at 5, 8 (July 15, 2019), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=ad97aaf1-79a5-4fd9-b5d2-fa60e7dc3e42 (hereinafter Order 1); *see* AS 42.05.421(a) ("When a tariff filing is made containing a new or revised rate . . . the [RCA] may, either upon written complaint or upon its own motion, after reasonable notice, conduct a hearing to determine the reasonableness and propriety of the filing.  Pending the hearing the [RCA] may, by order stating the reasons for its action, suspend the operation of the tariff filing.").

customers after the RCA finalized permanent rates.[7] The companies did not object to this order and elected to pay the statutory interest rate on any required refunds.

GHU/CUC filed revised permanent rate proposals with the RCA in August 2019. In their revised proposals, the companies sought permanent rate increases averaging approximately 16.6% for water services and 17.2% for wastewater services. The agency opened new dockets to consider these revised proposals and, at the companies' request, consolidated those dockets with the dockets it previously opened to consider the companies' May 2019 proposals.

The RCA then evaluated GHU/CUC's proposed permanent rate increases. It later issued a detailed order (Order 21) resolving contested issues affecting the rate calculation and directing the companies to submit revised rate proposals consistent with its decisions.[8] Order 21 addressed four issues that are relevant to this appeal.

First, the RCA set an allowed return on equity by taking the average of the results of four models proposed by GHU/CUC's expert and rejecting that expert's suggestion that the RCA should exclude the lowest of the four model results as an outlier.[9] Second, the RCA added a 75-basis-point risk premium to the average of the

---

[7] *Id.*; *see* AS 42.05.421(c) ("In the case of a proposed increased rate, the [RCA] may by order require the interested public utility or utilities to place in escrow . . . all amounts received by reason of the increase . . . . Upon completion of the hearing and decision the [RCA] may by order require the public utility to refund to the persons in whose behalf the amounts were paid, that portion of the increased rates which was found to be unreasonable or unlawful."); AS 45.45.010(a) ("The rate of interest in the state is 10.5 percent a year and no more on money after it is due . . . .").

[8] *See In re Golden Heart Utils., Inc.*, RCA Nos. U-19-070(21)/071(21)/087(18)/088(18), at 65-66 (Jan. 19, 2021), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=b34f54fb-5a28-4e22-9d1f-aa70ed57dba3 (hereinafter Order 21).

[9] *See id.* at 55-62. "Return on equity" compensates a company's shareholders for taking risks and forgoing other investment opportunities. When setting

results of the companies' expert's models when calculating the return on equity, which was less than the 175-basis-point premium that the companies had proposed.[10] Third, it denied the companies' request to adjust their rate base to treat certain plant additions placed in service in September 2018, December 2018, and May 2019 as though they had been in service throughout the 2018 "test year" that the companies used as the basis for their rate calculations.[11] Fourth, it declined to adjust rates upward based on the companies' projection that usage of their services would decline, concluding that the record did not support the proposed adjustments.[12]

GHU/CUC petitioned the RCA for reconsideration.[13] The RCA then issued an order (Order 26) that partially granted the companies' petition for reconsideration, but made only minor modifications to its original order.[14] Two

---

rates, the RCA multiplies the allowed return on equity by the amount of a utility's capital base that is financed with equity (rather than debt), then adds the product of that calculation to the amount of revenue that the utility is entitled to earn from ratepayers to cover its expenses. The appropriate return on equity is not directly observable; instead, the RCA sets a return on equity based on its assessment of how much compensation investors should reasonably expect for their investment given the company's risk profile.

[10] *See id.* at 58-62. One basis point is equal to 0.01 percentage points. *Basis point*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[11] Order 21, *supra* note 9, at 47-48. In the ratemaking context, "plant" refers to a utility's assets that are used to provide services to ratepayers, including its physical infrastructure. *See Mun. of Anchorage v. Regul. Comm'n of Alaska*, 215 P.3d 327, 329 (Alaska 2009).

[12] Order 21, *supra* note 9, at 28-30.

[13] *See* 3 AAC 48.105 ("Within 15 days after an order of the [RCA] is served, a party may file a petition for reconsideration . . . .").

[14] *In re Golden Heart Utils., Inc.*, RCA Nos. U-19-070(26)/071(26)/087(23)/088(23) (Apr. 30, 2021), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=bd5d6983-ef73-4c72-9c0e-af7ecc606897 (hereinafter Order 26).

commissioners dissented in part from the RCA's order on reconsideration.[15] The dissenting commissioners would have granted GHU/CUC higher returns on equity for their water and wastewater operations to compensate the companies for risks not reflected elsewhere in the RCA's calculations and allowed the companies to make two other adjustments that the panel denied.[16]

The net effect of the RCA's decisions, as modified on reconsideration, was to approve permanent rate increases of approximately 8.4% for water service and 10.6% for wastewater service. Because the permanent rate increases were less than the interim rate increases the RCA had granted, GHU/CUC were obligated to refund approximately $1 million to their customers.

### C. Proceedings Before The Superior Court

GHU/CUC appealed the RCA's decisions in Orders 1, 21, and 26 to the superior court, restating several arguments they had advanced before the RCA.[17] In their opening brief, the companies also argued for the first time that the RCA erred by requiring the companies to either place the revenue from interim rate increases in escrow or pay the maximum statutory interest rate on any required refunds. The superior court affirmed the RCA's orders in full.[18] The court then stayed its decision pending further appeal.

---

[15] *See id.* (Pickett and Wilson, Comm'rs, dissenting), https://rca.alaska.gov/ RCAWeb/ViewFile.aspx?id=ef7db455-b915-4011-96af-9438038c50f7.

[16] *Id.* at 2-3.

[17] *See* AS 22.10.020(d) ("The superior court has jurisdiction in all matters appealed to it from a[n] . . . administrative agency when appeal is provided by law . . . ."); AS 42.05.551(a) ("All final orders of the [RCA] are subject to judicial review in accordance with AS 44.62.560-44.62.570."); Alaska R. App. P. 602(a)(2) ("An appeal may be taken to the superior court from an administrative agency . . . .").

[18] *Golden Heart Utils., Inc. v. Reg. Comm'n of Alaska*, No. 3AN-21-06152 CI (Alaska Super., Dec. 21, 2022).

GHU/CUC appeal.[19]

## III. STANDARD OF REVIEW

"When the superior court acts as an intermediate court of appeal, we give no deference to its decision."[20] Instead, "we review the merits of the administrative agency['s] determination directly."[21]

We review an agency's factual findings "to determine whether they are supported by substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support [the agency's] conclusion."[22] Under the substantial evidence standard, "we do not independently weigh the evidence," but instead "only determine whether such evidence exists."[23]

When reviewing an agency's resolution of "questions of law involving 'agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions,' " we apply the reasonable basis standard of review,[24] deferring to the agency's interpretation "so long as it is reasonable."[25]

---

**19** *See* AS 22.05.010(c) ("A decision of the superior court on an appeal from an administrative agency decision may be appealed to the supreme court as a matter of right.").

**20** *Teck Am. Inc. v. Valhalla Mining, LLC*, 528 P.3d 30, 34 (Alaska 2023) (quoting *N. Alaska Env't Ctr. v. State, Dep't of Nat. Res.*, 2 P.3d 629, 633 (Alaska 2000)).

**21** *Id.* (quoting *N. Alaska Env't Ctr.*, 2 P.3d at 633).

**22** *Id.* (alteration in original) (quoting *French v. Alaska Oil & Gas Conservation Comm'n*, 498 P.3d 1026, 1028 (Alaska 2021)).

**23** *United Utils., Inc. v. Alaska Pub. Utils. Comm'n*, 935 P.2d 811, 814 (Alaska 1997).

**24** *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014) (quoting *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011)).

**25** *Teck Am.*, 528 P.3d at 34 (quoting *Marathon Oil*, 254 P.3d at 1082).

When an agency has resolved a question of law that does not involve the agency's expertise or policy judgments within the scope of its statutory functions, we may substitute our independent judgment for that of the agency when reviewing its decision, "even if the agency's decision had a reasonable basis in law."[26] We also exercise our independent judgment when deciding the scope of an agency's authority.[27] We do the same when deciding whether an agency action is a regulation that must be promulgated in accordance with the Alaska Administrative Procedure Act.[28] When applying our independent judgment, we adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[29]

## IV. DISCUSSION

GHU/CUC argue that the RCA erred in Orders 21 and 26 by disallowing some of the adjustments they proposed to their rate calculation, leading to permanent rates that were too low. They also argue that it was impermissible for the RCA to require them to choose between placing revenue received from interim rate increases in escrow or paying interest on any required refunds, as it did in Order 1. Because the RCA had a reasonable basis for its decisions in Orders 21 and 26, the rates resulting from those orders were not confiscatory, and GHU/CUC did not preserve their arguments or show any plain error regarding Order 1, we affirm the superior court's judgment upholding the RCA's decisions.

---

[26] *Davis Wright Tremaine*, 324 P.3d at 299 (quoting *Tesoro Alaska Petrol. Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

[27] *Regul. Comm'n of Alaska v. Matanuska Elec. Ass'n*, 436 P.3d 1015, 1025 (Alaska 2019).

[28] *See Chevron U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 35 (Alaska 2016).

[29] *State, Dep't of Revenue v. Nabors Int'l Fin., Inc.*, 514 P.3d 893, 898 (Alaska 2022) (quoting *Premera Blue Cross v. State, Dep't of Com., Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1115 (Alaska 2007)).

## A. The RCA Had A Reasonable Basis For Its Decisions In Orders 21 And 26.

Because the RCA's ratemaking decisions in both Order 21[30] and Order 26[31] involve "agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions," we review those decisions under the reasonable basis standard of review.[32] GHU/CUC argue that the RCA lacked a reasonable basis for several of these decisions. The companies contend that the agency should have allowed a higher return on equity, allowed upward rate adjustments to compensate the companies for certain investments they made in 2018 and 2019, and allowed an upward rate adjustment to compensate for declining usage of their water and wastewater services. We agree with the superior court that the RCA had a reasonable basis for its decisions.

### 1. The RCA had a reasonable basis for its decisions regarding the allowed return on equity for GHU/CUC.

GHU/CUC challenge two of the RCA's decisions related to its calculation of return on equity. First, they argue the RCA lacked a reasonable basis for including the result of the "market-to-book" model prepared by the companies' expert, Dr. David Blessing, in its calculation because that result was an outlier. Second, they argue the RCA lacked a reasonable basis for allowing only a 75-basis-point risk premium, rather than the higher risk premium they proposed. We conclude that the RCA had a reasonable basis for these decisions.

---

[30] *Supra* note 9.

[31] *Supra* note 14.

[32] *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011); *see* AS 42.05.141 (describing RCA's powers and duties, including making or requiring "just, fair, and reasonable rates . . . for a public utility").

### a. The RCA had a reasonable basis for including the result of Dr. Blessing's market-to-book model in its return-on-equity calculation.

The RCA explained that it included the result of Dr. Blessing's market-to-book model despite its outlying value because "[n]o testimony or evidence questioned the methodology" underlying the model and "[a]n outlying result is not necessarily an incorrect result."[33] The RCA's decision to include the result of this model and give it equal weight to the results of other models was consistent with our precedent and supported by expert testimony in the record. We have previously affirmed as reasonable the RCA's decision to take the average of the results of multiple models when determining the appropriate return on equity in a ratemaking case.[34] In this case, the RCA heard expert testimony that averaging the results of several models to estimate an appropriate return on equity is "standard practice," in part because return on equity depends on investor expectations and "investors will use all available estimates, including the results of standard analyses, to develop their expectations." In light of our precedent and the evidence in the record, the RCA had a reasonable basis for including the result of the market-to-book model and giving it equal weight to the results of other models when calculating GHU/CUC's allowed return on equity.

GHU/CUC argue that the RCA's decision to include the result of the market-to-book model in its return-on-equity calculation lacks a reasonable basis because its decision was "inconsistent with RCA precedent" and unpredictable or arbitrary. We disagree. An agency has a duty to acknowledge it is departing from a prior decision when it overrules a general rule announced in an earlier decision,[35] and

---

[33] *See* Order 21, *supra* note 8, at 61.

[34] *Amerada Hess Pipeline Corp. v. Regul. Comm'n of Alaska*, 176 P.3d 667, 685 (Alaska 2008).

[35] *See May v. State, Com. Fisheries Entry Comm'n*, 168 P.3d 873, 884 (Alaska 2007); *see also Amerada Hess*, 176 P.3d at 685.

it sometimes must distinguish a prior case when it concludes the law applies differently to similar facts in a subsequent case.[36] However, the companies have not shown that the RCA's treatment of the outlying model result in this case triggered either of these duties.

The prior RCA orders on which GHU/CUC rely reveal that each of the RCA's recent decisions to exclude an outlying data point was a fact-intensive judgment made as an interim step in a technical decision-making process rather than an application of a rigid general rule.[37] The RCA did not improperly depart from these prior decisions by deciding not to exclude the outlying model result based on the record developed in this case.

Finally, GHU/CUC argue that the RCA erred by finding that the companies had described their market-to-book calculation as "more accurate" than other calculations. They argue that this finding was not supported by substantial

---

[36] *See, e.g.*, *May*, 168 P.3d at 883-84; *Black v. Mun. of Anchorage, Bd. of Equalization*, 187 P.3d 1096, 1098-99, 1102-03 (Alaska 2008); *Amerada Hess*, 176 P.3d at 677-79, 683-85.

[37] *See In re Telecomms. Relay Servs.*, RCA No. U-20-018(2), at 4 n.17 (May 14, 2021), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=8ffec798-7035-4378-8900-2721f671804d (excluding outlying count of telephone lines for one month, noting affected month's line count included "catch up data"); *In re Cook Inlet Nat. Gas Storage Alaska, LLC*, RCA No. U-18-043(15), at 82 (Aug. 16, 2019), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=300323a4-5fe9-4654-9634-50355ce42733 (excluding outlying result of one growth rate model that opposing expert had criticized as "improperly specified," and noting model had "inadequate support" and model's proponent had given it "outsized weight"); *In re Mun. of Anchorage*, RCA No. U-08-157(10)/158(10), at 37-38 (Feb. 11, 2010), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=fec104dc-a384-4259-a403-7c3e9173f447 (excluding one analyst's outlying estimate of growth rate of one proxy company); *In re Golden Heart Utils., Inc.*, RCA No. U-07-076(8)/077(8), at 65 (June 30, 2008), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=92eb2edc-36e0-429e-8ad5-ba12ddfe9a49 (excluding outlying estimated growth rate of one proxy company because it was "too far from the median value and thus inappropriately inflated the average").

evidence and that they never represented that the market-to-book calculation was "more accurate." However, the context of the agency proceedings makes clear that this portion of the agency's order was referring to the companies' expert's statement that a "recalculation" he performed was "more accurate" than his original calculation, and that his original calculation had contained an error.[38] Understood in this context, the RCA's finding that the recalculated result was "more accurate" was supported by substantial evidence.

### b. The RCA had a reasonable basis for applying a 75-basis-point risk premium rather than the 175-basis-point risk premium that GHU/CUC proposed.

The RCA explained in Order 21 that it applied only a 75-basis-point risk premium in its return-on-equity calculation because it found GHU/CUC "did not present objective or quantitative evidence" that they faced greater risks than companies in the proxy group on which the companies' expert based his return on equity calculations.[39] The RCA also noted that it had received "a great deal of testimony regarding the unreliability" of the companies' proposed 175-basis-point risk premium.[40] Finally, the RCA expressed reservations about "the appropriateness of awarding an additional Alaska-specific risk premium," but ultimately approved a 75-basis-point risk premium because "both expert witnesses of record agree[d]" that the premium should be at least that amount in this case.[41] Based on this record, the RCA had a reasonable basis for deciding to allow a 75-basis-point risk premium rather than a 175-basis-point premium.

---

[38]    *See* Order 21, *supra* note 8, at 60-61.

[39]    *Id.* at 61.

[40]    *Id.*

[41]    *Id.*

GHU/CUC raise a variety of objections to the RCA's decision to disallow their proposed risk premium: They argue that the RCA erred by applying the wrong standard of proof, departing from agency precedent in prior rate cases in which the RCA allowed higher risk premiums, failing to address their arguments in favor of a size-related risk premium, and declining to award a higher risk premium despite acknowledging that they faced high costs related to the challenges of operating in and around Fairbanks. We disagree. The record shows that the RCA considered the companies' arguments and the evidence, applied the correct legal standards, and allowed a risk premium that had a reasonable basis in fact and law. We decline to reweigh the evidence to find support for a different result.[42]

The RCA did not unreasonably depart from its prior decisions by awarding a 75-basis-point risk premium in this case. GHU/CUC identify two rate cases in which they argue the RCA approved high, Alaska-specific risk premiums for other utilities.[43] They also note that the RCA allowed high risk premiums in some of

---

[42] *See Pacifica Marine, Inc. v. Solomon Gold, Inc*., 356 P.3d 780, 788 (Alaska 2015) ("We will not reweigh conflicting evidence, determine witness credibility, or evaluate competing inferences from testimony, as these functions are reserved to the agency." (quoting *Vonder Haar v. State, Dep't of Admin., Div. of Motor Vehicles*, 349 P.3d 173, 177 (Alaska 2015))).

[43] *See In re Enstar Nat. Gas Co.*, RCA No. U-16-066(19), at 52 (Sept. 22, 2017), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=6472a4a7-c344-4449-936b-ed28d05a8029 (allowing risk premium based in part on "current economic conditions in Alaska"); *In re Alaska Elec. Light & Power Co.*, RCA No. U-10-029(15), at 33, 37 (Sept. 2, 2011), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=ac4f9692-5ad8-49de-aa5c-e60299d91614 (allowing risk premium and acknowledging expert testimony regarding "a perception by investors that Alaska utilities have greater business risks" than peer companies).

GHU/CUC's own prior rate cases.[44]  However, every rate case is based on a unique record, and we defer to the RCA's reasonable interpretation and application of its prior decisions in subsequent adjudications.[45]  Contrary to GHU/CUC's arguments, the RCA's decision not to allow their proposed risk premium based on the record developed in this case did not "overrule" its prior decisions because the prior decisions were based on different facts and circumstances.

The RCA did not improperly disregard GHU/CUC's evidence in favor of a size-related risk premium to account for the fact that they are smaller than the companies in the proxy group.  Order 21 states that the RCA granted a risk premium based on unspecified "additional risks" that GHU/CUC face compared to peer companies, and the RCA expressly acknowledged that GHU/CUC's expert proposed a risk premium for "size or location."[46]

Finally, it was reasonable for the RCA to reject a 175-basis-point risk premium while acknowledging elsewhere in its order that GHU/CUC face higher costs because of the unique challenges of operating in and around Fairbanks.[47]  Other parts of the rate calculation already account for the high costs that the companies face while operating in this region of Alaska.  The RCA has discretion to decide that a risk

---

**44**    *See In re Golden Heart Utils., Inc.*, RCA No. U-07-076(8)/077(8), at 69-71 (June 30, 2008), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=92eb2edc-36e0-429e-8ad5-ba12ddfe9a49; *In re Golden Heart Utils. Inc.*, RCA No. U-05-043(15)/044(15), at 49-50 (Jan. 8, 2007), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=8AA98756-F7CB-4CE4-A95B-9BE780065AF6; *In re Golden Heart Utils., Inc.*, RCA No. U-00-115(13)/116(12)/146(10), at 16 (Sept. 24, 2001), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=9E8D0D6B-FF5A-440E-B09E-AEC0D07C50C8.

**45**    *See Amerada Hess Pipeline Corp. v. Regul. Comm'n of Alaska*, 176 P.3d 667, 679 (Alaska 2008).

**46**    Order 21, *supra* note 8, at 58-59, 61.

**47**    *See id.* at 21.

premium is warranted only to compensate for high *variance* in returns that might result from exposure to unpredictable or infrequent events, rather than as compensation for predictably high costs that result from operating in a difficult climate like that in Fairbanks.

### 2. The RCA had a reasonable basis for disallowing some of GHU/CUC's proposed adjustments to its test-year rate base.

The RCA disallowed proposed adjustments to GHU/CUC's test-year rate base for some plant additions that the companies made near the end of or after the 2018 test year. The companies sought to have these plant additions treated as though they had been in place for the entire test year.[48] The RCA disallowed adjustments for capital projects extending service to the Chena Marina residential area beginning in September 2018, adding a wastewater screening system in December 2018, and installing new clarifiers and an influent pump in the companies' wastewater treatment plant in May 2019.[49] The companies argue that we should reverse the RCA's decision to deny these proposed adjustments because the agency did not provide a sufficient explanation for its decisions and its decisions departed from precedent it set in prior rate cases. We disagree. Because the RCA articulated a reasonable basis for each of its decisions regarding the companies' proposed adjustments and adequately explained any differences between its decisions in this case and in its prior rate cases, we uphold the RCA's decisions.

---

[48] The RCA noted in Order 21 that there are two related but distinct kinds of adjustments at issue in this case: (1) "annualizing adjustments" to count plant that was placed in service during the test year as though it had been in service throughout the test year, and (2) "out-of-test year plant additions" to add plant to the rate base even though the utilities did not place it into service until after the end of the test year. *See id.* at 39; *see also supra* note 15 (defining "plant" in ratemaking context).

[49] Order 21, *supra* note 8, at 48.

The record demonstrates that the RCA disallowed GHU/CUC's proposed adjustments to their test-year rate base in part because those adjustments could cause problems with the synchronization of the rate calculation. The RCA explained that synchronization requires the "proper matching or balancing of operating expenses (including depreciation and taxes), rate base, and revenue."[50] When the expenses, rate base, and revenue captured in the rate calculation are not aligned to the same test-year period, the resulting rates may not accurately reflect the company's true revenue needs. Because adjusting the test-year rate base can lead to synchronization problems, the RCA has generally required utilities to demonstrate distinct benefits to ratepayers before it has allowed adjustments to the test-year rate base.[51] In this case, the record shows that the RCA could reasonably have concluded that the projects for which GHU/CUC sought adjustments did not provide sufficient benefits to all ratepayers to outweigh the

---

[50] *Id.* at 44 (quoting *In re Alaska Elec. Light & Power Co.*, RCA No. U-10-029(15), at 25 (Sept. 2, 2011), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=ac4f9692-5ad8-49de-aa5c-e60299d91614).

[51] *See In re Enstar Nat. Gas Co.*, RCA No. U-16-066(19), at 26 (Sept. 22, 2017), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=6472a4a7-c344-4449-936b-ed28d05a8029 (explaining RCA has allowed annualizing adjustments "for plant placed in service during the test year that provides a benefit to ratepayers, such as a reduction in costs or an increase in safety and reliability"); *see also In re Alaska Elec. Light & Power Co.*, RCA No. U-10-029(15), at 27-28 (Sept. 2, 2011), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=ac4f9692-5ad8-49de-aa5c-e60299d91614 (allowing annualizing adjustment for project that would benefit ratepayers by reducing costs); *In re Mun. of Anchorage*, RCA No. U-08-157(10), at 26-28 (Feb. 11, 2010), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=fec104dc-a384-4259-a403-7c3e9173f447 (allowing annualizing adjustment for project that would "benefit[] customers by enhancing service reliability and fire protection"); *In re Chugach Elec. Ass'n*, RCA No. U-01-108(26), at 59-64 (Jan. 31, 2003), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=21C3B9FB-C320-4C7F-A4E2-340CF56D6FE7 (allowing adjustment for projects leading to savings for ratepayers where capital costs for those projects were among "the key reasons" why utility sought rate increase and adjustments were supported by "a complete and adequate record").

risk of synchronization problems.[52]  Because the record shows that the RCA had a reasonable basis for this decision, we will not second-guess the agency's expert judgment.

GHU/CUC argue that the RCA should not be permitted to rely on synchronization issues as a basis for defending its decisions on appeal because the agency did not clearly identify synchronization issues as the basis for disallowing some of the proposed adjustments.  However, the RCA's extended discussion of synchronization issues in Order 21 made clear that synchronization concerns were a central factor in its decision-making.[53]  In Order 26, the RCA emphasized the importance of minimizing synchronization issues when considering any proposed adjustments to the test-year rate base.[54]  This discussion was more than adequate to make the RCA's reasoning about synchronization clear, enabling meaningful judicial review.[55]  We therefore reject the companies' argument that we cannot rely on synchronization issues as a reasonable basis for the RCA's decision.

GHU/CUC also argue that the RCA should have allowed their proposed adjustments to their test-year rate base because the agency has sometimes allowed adjustments to the test-year rate base in cases involving other utility companies.

---

[52]     *See* Order 21, *supra* note 8, at 48.

[53]     *See id.* at 39-45.

[54]     *See* Order 26, *supra* note 15, at 8-9.

[55]     *See Se. Alaska Conservation Council, Inc. v. State*, 665 P.2d 544, 549 (Alaska 1983) (instructing courts to "focus[] on the decisional document" when reviewing reasonableness of agency action) , *superseded by statute on other grounds*, ch. 86, §§ 1(b), 2, SLA 2003; *City of Nome v. Cath. Bishop of N. Alaska*, 707 P.2d 870, 875 (Alaska 1985) (holding agencies making adjudicative decisions "must articulate [their] reasons"); *cf. Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that under federal administrative law, "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency").

However, the companies do not identify any decision in which the RCA has stated a general rule that would require it to allow the adjustments at issue in this case. They likewise do not identify any RCA decision allowing an adjustment based on facts so analogous to those in this case that it was unreasonable for the RCA to disallow the adjustments at issue here.

Finally, GHU/CUC argue that the size of their investments in the plant additions was a relevant issue that the RCA should have considered and that its failure to do so erodes the degree of deference to be afforded to its decision.[56] But even if we agreed and extended somewhat less deference to the RCA because it did not expressly discuss the size of the companies' investment, the potential synchronization issues arising from the proposed adjustments would still support the RCA's decision.

### 3. The RCA had a reasonable basis for disallowing GHU/CUC's proposed adjustment for projected declining usage.

The RCA also disallowed a proposed rate adjustment based on GHU/CUC's projection that usage of their services would decline because the agency concluded that the record did not support the proposed adjustments.[57] The companies argue that the agency held them to the wrong standard of proof when disallowing this proposed adjustment and failed to explain how rates set without the adjustment were "just and reasonable." We disagree. The agency considered an extensive record, applied the correct legal standards, and simply found that the companies' evidence in support of the proposed adjustment was not persuasive.[58]

---

[56] *See Amerada Hess Pipeline Corp. v. Regul. Comm'n of Alaska*, 176 P.3d 667, 673, 679 (Alaska 2008).

[57] Order 21, *supra* note 8, at 28-30.

[58] *See* AS 42.05.421(d) ("One who initiates a change in existing tariffs shall bear the burden to prove the reasonableness of the change.").

The RCA's decision to disallow the proposed adjustment for declining usage was a reasonable way of reconciling the conflicting expert testimony it received regarding the proposed adjustment. The agency expressed several specific concerns regarding the methodology GHU/CUC used to calculate the proposed adjustment and called the model used to support that adjustment "significantly flawed." It also found that the usage declines the companies projected were "significantly overstated compared with actual declines." We decline to reweigh the expert testimony that the agency considered when evaluating this proposed adjustment.[59]

GHU/CUC argue that even if the RCA disagreed with their proposed adjustment for declining usage, there was sufficient evidence in the record to support a smaller adjustment and the RCA erred by not allowing any adjustment at all. The companies rely on *Glacier State Telephone Co. v. Alaska Public Utilities Commission*, in which we reversed, in part, a decision by the RCA's predecessor agency to exclude some expenses in a utility's rate base and remanded to the agency to determine whether it should have included a subset of the expenses.[60] GHU/CUC argue that the RCA's decision to disallow an adjustment in this case is inconsistent with *Glacier State* because the RCA acknowledged that GHU/CUC were facing declining consumption. However, unlike this case, *Glacier State* involved an agency decision disallowing actual test-year expenses, some of which were undisputed.[61] In this case, by contrast, the RCA decided the adjustments GHU/CUC proposed were not yet "fully support[ed] by data and testimony."[62] Its decision to disallow the proposed usage adjustment without allowing a smaller adjustment was reasonable and consistent with *Glacier State*.

---

[59] *See Pacifica Marine, Inc. v. Solomon Gold, Inc.*, 356 P.3d 780, 788 (Alaska 2015).

[60] 724 P.2d 1187, 1193 (Alaska 1986).

[61] *Id.*

[62] *See* Order 21, *supra* note 8, at 30.

Finally, GHU/CUC argue that the RCA's decision not to allow an adjustment for declining usage was unreasonable because it will force them to pursue more frequent rate cases to mitigate "regulatory lag."  But the potential impact that rate adjustments have on the frequency of the filing of rate cases is precisely the kind of policy judgment that we leave to the RCA and the legislature.  Because the RCA had a reasonable basis for its decision to disallow the proposed adjustment for declining usage, we uphold the agency's decision.

## B.     GHU/CUC Have Not Shown That The Rates The RCA Approved Were Confiscatory.

GHU/CUC argue that even if the individual decisions the RCA made were reasonable, the agency erred because, in aggregate, its decisions resulted in rates that threaten the companies' "financial integrity."  They argue the resulting rates were confiscatory and unconstitutionally deprived them of property without due process.[63] Because these constitutional issues do not implicate the RCA's specialized expertise or policy judgments within the scope of the agency's statutory functions,[64] we substitute our judgment for that of the RCA, extending no deference to its decision.[65]  Applying our independent judgment, we conclude that the companies have not shown that the

---

[63]     *See* Alaska Const. art. I, § 7; U.S. Const. amend. XIV, § 1; *see also United States v. RCA Alaska Commc'ns, Inc.*, 597 P.2d 489, 507 (Alaska 1978) ("[T]he ultimate issue in confiscation questions is whether due process will be violated by the continued operation of the rate."), *abrogated on other grounds by Owsichek v. State, Guide Licensing & Control Bd.*, 627 P.2d 616, 620 (Alaska 1981); *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n*, 262 U.S. 679, 690 (1923) ("Rates which are not sufficient to yield a reasonable return . . . are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment.").

[64]     *Cf.* AS 42.05.141 (describing RCA's powers and duties).

[65]     *See N. Slope Borough v. State, Dep't of Educ. & Early Dev.*, 484 P.3d 106, 113 (Alaska 2021).

rates approved by the RCA fell outside the broad "constitutional range of reasonableness" that applies in ratemaking proceedings.[66]

Public utilities bear a heavy burden to prove that a rate is confiscatory,[67] and GHU/CUC have not carried that burden here. When analyzing whether a rate amounts to an unconstitutional taking, we assess the "impact of the rate order," not the ratemaking methodology or other "economic niceties" involved in the ratemaking proceeding.[68] Accordingly, we have declined to find that a rate is confiscatory in the absence of a showing that the rate "threatens [the utility's] financial integrity."[69]

GHU/CUC have not shown that the RCA's decisions threaten their financial integrity. While the companies argue that the rates the RCA approved will produce less revenue than their proposed rates and will force them to pay refunds to customers, the companies have not shown that those outcomes will "jeopardize" the companies' financial integrity by "leaving them [with] insufficient operating capital" or "impeding their ability to raise future capital."[70] The companies argue that the RCA should nonetheless have analyzed whether the cumulative effect of its decisions would cause them financial harm and explained how its decisions provided adequate protection for the companies' financial integrity for the "foreseeable future." We

---

[66]    *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 312 (1989).

[67]    *Cf. Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968) ("A presumption of validity . . . attaches to each exercise of the [Federal Power] Commission's expertise, and those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' " (quoting *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 602 (1944))).

[68]    *Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n*, 836 P.2d 343, 349 (Alaska 1992) (quoting *Duquesne Light Co.*, 488 U.S. at 314).

[69]    *Id.* at 350.

[70]    *See Duquesne Light Co.*, 488 U.S. at 312.

disagree. The companies' argument turns the applicable burden of proof on its head.[71] The RCA is free to balance the interests of utility investors, ratepayers, and the broader public to set rates within the constitutional range of reasonableness; a public utility challenging approved rates, not the agency, has the burden of establishing that those rates threaten the utility's financial integrity.[72]

Because GHU/CUC have not shown that the rates the RCA approved fall outside the broad constitutional range of reasonableness under both the Alaska Constitution and the United States Constitution,[73] we will not disturb the superior court's judgment upholding the agency's determinations.

### C. GHU/CUC Did Not Preserve Their Arguments Regarding Order 1, And The RCA's Order Did Not Amount To Plain Error.

Finally, GHU/CUC challenge Order 1, in which the RCA set parameters for how the companies would handle revenue they received under their interim rates.[74] Order 1 gave the companies a choice between placing revenue received under the interim rates in escrow or paying the maximum statutory interest rate of 10.5% on any refunds owed to customers.[75] Because the permanent rates the RCA approved were lower than the interim rates, the companies now owe refunds to customers totaling approximately $1 million.

GHU/CUC argue the RCA lacked authority to force them to choose between placing revenue in escrow and paying interest on refunds. They also argue the

---

[71] *See Cook Inlet Pipe Line Co.*, 836 P.2d at 349-50.

[72] *See id.*

[73] *See id.* at 350 (recognizing RCA's predecessor agency had "broad limits within which it may exercise its regulatory ratemaking power without running afoul of constitutional protection of private property"); *Duquesne Light Co.*, 488 U.S. at 316.

[74] *See* Order 1, *supra* note 6, at 5.

[75] *See id.*; AS 42.05.421(c) (authorizing RCA to require escrow in this context); AS 45.45.010(a) (providing maximum interest rate).

RCA acted unreasonably and failed to follow relevant precedent by requiring them to make this choice. Finally, the companies argue the RCA did not follow the correct procedures and should have promulgated a regulation before requiring them to choose between placing funds in escrow or paying interest on refunds.[76]

We first observe that GHU/CUC failed to preserve any of their arguments regarding Order 1 for appellate review because they did not raise them before the RCA. "[W]e will not consider arguments . . . never presented to an agency whose decision is appealed" if the challenger had "an opportunity to present objections to the agency before a decision [was] rendered by that agency."[77] Because the Alaska Administrative Procedure Act provides that "[t]he right to appeal is not affected by the failure to seek reconsideration before the agency,"[78] a party does not fail to preserve an issue by not raising it before the agency if the first opportunity to do so would have been in a motion for reconsideration.[79] Applying these standards, we conclude that the companies failed to preserve the issues they raise regarding Order 1.

GHU/CUC had an opportunity to object to Order 1 before the RCA without filing a motion for reconsideration, but they failed to do so. Specifically, the companies could have elected to place revenue from interim rates into escrow and simultaneously objected to the RCA's authority to require the maximum statutory interest rate on any required refunds. Instead, without objecting, the companies elected to pay interest on refunds at the rate the RCA offered. Because the companies did not

---

[76]    *See* AS 44.62.010-.950.

[77]    *Amerada Hess Pipeline Corp. v. Alaska Pub. Utils. Comm'n*, 711 P.2d 1170, 1181 n.22 (Alaska 1986); *see also West v. Alaska Mental Health Tr. Auth.*, 467 P.3d 1064, 1071-72 & n.36 (Alaska 2020). *But see Walker v. State, Dep't of Corr.*, 421 P.3d 74, 81 (Alaska 2018) (holding different rule applies to prison disciplinary appeals).

[78]    AS 44.62.560(a); *see also* AS 42.06.480(a) (providing that AS 44.62.560 applies to appeals from RCA decisions).

[79]    *See Amerada Hess*, 711 P.2d at 1181 n.22.

raise their objections in their response to Order 1 or present any related arguments in their other filings before the RCA, they failed to preserve their objections for appellate review.[80]

Although GHU/CUC failed to preserve the issues they raise regarding Order 1, they argue that we should reverse because the RCA's actions constituted plain error.[81] But there is no such error here.

To constitute plain error, a mistake must be "obviously prejudicial" to the party challenging it on appeal,[82] and any error the RCA may have made in Order 1 was not obviously prejudicial to GHU/CUC. The companies chose to pay the statutory maximum interest rate on refunds when they could instead have placed the funds in escrow. The companies do not challenge the agency's authority to require the funds to be placed in escrow.[83] If the RCA had not offered the companies a choice and instead had required them to place the funds in escrow — as the agency did in a 2022 case involving another utility that objected to a similar choice[84] — the companies would have been no better off than they would have been if they had voluntarily chosen that option in response to Order 1. Having voluntarily chosen to pay interest rather than place funds in escrow, the companies cannot now claim that any difference between

---

[80]     *Cf. Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985) (holding that litigants may "expand or refine details of an argument otherwise preserved" under certain conditions).

[81]     *See Far N. Sanitation, Inc. v. Alaska Pub. Utils. Comm'n*, 825 P.2d 867, 870 (Alaska 1992).

[82]     *See In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014) (quoting *Adams v. State*, 261 P.3d 758, 770 (Alaska 2011)).

[83]     *See* AS 42.05.421(c).

[84]     *See In re Alaska Elec. Light & Power Co.*, RCA No. U-22-078(5) at 1-6 (Oct. 12, 2022), https://rca.alaska.gov/RCAWeb/ViewFile.aspx?id=c16b8c6f-aca8-44cc-aeb2-cc24abbbda72.

these two options was obviously prejudicial to them. Because any error the RCA may have made was not obviously prejudicial, we affirm the superior court's decision regarding Order 1.

## V.    CONCLUSION

We AFFIRM the superior court's judgment upholding the agency's decisions.